# In the United States Court of Federal Claims

No. 21-1693
(Filed:  15 September 2022[*])

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DOLPHIN PARK TT, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | *   Post-Award Bid Protest; Motion for |
| THE UNITED STATES, | *   Judgment on the Administrative Record; |
| | *   Flood-Plain Determination; Meaningful |
| Defendant, | *   Discussions; Prejudice; Permanent |
| | *   Injunction; Standing; Disparate Treatment. |
| and | * |
| | * |
| IMPERIUM EQUITY PARTNERS, LLC, | * |
| | * |
| Defendant-Intervenor. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Richard J. Conway*, Blank Rome LLP, with whom were *Samarth Barot*, both of Washington, DC, *Brian S. Gocial*, of Philadelphia, PA, *Michael J. Slattery*, of New York, NY, for plaintiff.

*Vijaya S. Surampudi*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Eric P. Bruskin*, Assistant Director, all of Washington, DC, for defendant.  *Liana D. Henry* and *Tammi Snyder-Queen*, Attorney-Advisors, Office of General Counsel, General Services Administration, of counsel.

*Diana Parks*, Curran Legal Services Group, Inc., with whom was *Hadeel N. Masseoud*, both of Marietta, GA, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

---

[*] This Opinion was originally filed under seal pursuant to the protective order in this case on 12 September 2022, ECF No. 113.  The Court provided the parties the opportunity to review the Opinion for any proprietary, confidential, or other protected information, and submit to the Court proposed redactions no later than 16 September 2022 at 12:00 p.m. (EDT).  On 15 September 2022, the parties emailed the Court confirming no party proposes any redactions.  This Opinion is now reissued for publication.

Plaintiff Dolphin Park TT, LLC brings this post-award bid protest challenging the U.S. General Services Administration's lease award to defendant-intervenor Imperium Equity Partners, LLC. Plaintiff submitted numerous proposals—including its final proposal—containing incorrect floodplain designations. Plaintiff also made its proposal conditional on the government accepting numerous deviations from the solicitation, which the government declined to accept. Plaintiff alleges the government failed to conduct meaningful discussions of these issues, evaluated proposals in a prejudicially disparate manner, and erred by agreeing with plaintiff's erroneous proposal and excluding plaintiff from the award. Plaintiff, however, is responsible for submitting a well-written proposal. The government is entitled to rely on the information contained in proposals—consistent with the evidence on the record and plaintiff's many proposal revisions, the government properly excluded plaintiff's property due to its floodplain status. Pending before the Court are plaintiff's motion for judgment on the administrative record and motion for a permanent injunction, the government's cross-MJAR, and defendant-intervenor's cross-MJAR and motion to dismiss. For the following reasons, the Court denies plaintiff's MJAR, denies plaintiff's motion for permanent injunction, grants the government's and defendant-intervenor's cross-MJARs, and denies defendant-intervenor's motion to dismiss.

## I.      Factual Background

### A.      The Request for Lease Proposals

On 17 November 2020, the General Services Administration ("GSA") issued Request for Lease Proposals No. 6FL0544 ("RLP") to procure office space in Miami, Florida, for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATFE"). AR at 1891 (RLP cover sheet), ECF No. 51. The RLP stated the lease would be awarded "to the responsible Offeror whose offer conforms to the requirements of this RLP and the Lease documents and is the lowest priced technically acceptable offer submitted." AR at 1942 (RLP § 4.03(A)). Section 2.02 of the amended RLP stated "[a] Lease will not be awarded for any offered Property located within a 100-year floodplain unless the Government has determined that there is no practicable alternative." AR at 1933 (RLP § 2.02). Section 2.02 further stated: "a Lease will not be awarded for any offered Property adjacent to [a] 100-year floodplain, where such an adjacency would, as determined by the [lease contracting officer], in his or her sole discretion, restrict ingress or egress to the Premises in the event of a flood, unless there is no practicable alternative." *Id.* Among other confirmations, each offeror, as a part of its proposal, was required to indicate whether its property was: (1) "in a base (100-year) flood plain"; (2) "in a 500-year flood plain"; or (3) "not in a flood plain." AR at 636 (form 1364 within a sample lease proposal form for the RLP).

The RLP required offerors to provide documentation of their property interest in the proposed building either by providing a deed, lease, a fully executed written agreement to acquire the proposed building together with a statement from the current owner, or other "satisfactory" documentation "prior to award." AR at 1938–39 (RLP § 3.06(D)–(E)). The RLP further required that offerors' property interest "submittals must remain current," and offerors are "required to submit updated documents as required." *Id.* Offerors could obtain a deviation from the RLP requirements, but were advised: "GSA at its sole discretion will make the decision

whether or not to accept the deviation[,]" AR at 1941 (RLP § 3.06(X)); "the Government will not be under any obligation to award a Lease" to offers taking exception to or modifying an RLP provision, AR at 1942 (RLP § 4.03(C)); and, unless construed otherwise, offers containing deviations would be considered non-compliant, AR at 2049 (GSAM § 552.270-1(c)(6), incorporated in the RLP).

### B.    Plaintiff's Proposals and Agency Discussions

Since 2008, plaintiff has been the incumbent lessor for the RLP and submitted a proposal for the same office space it currently leases to the ATFE on 15 December 2020.  Am. Compl. ¶ 3, ECF No. 50; AR at 678 (plaintiff's initial proposal).  In its initial proposal, plaintiff marked its property as "in a 500-year flood plain."  AR at 680.  Despite this representation, plaintiff's initial proposal included the National Flood Hazard Layer ("NFHL") Flood Insurance Rate Map ("FIRM") No. 12086C0267L, generated by the official Federal Emergency Management Agency ("FEMA") website, which showed plaintiff's property within a 100-year floodplain.  AR at 696; Pl.'s MJAR & Mot. PI ("Pl.'s MJAR") at 4, ECF No. 54.  Further, plaintiff's initial proposal included an "additional remarks and/or conditions" addendum in response to item number 31 on form 1364, containing twenty terms, stating:  "This Offer is conditioned upon the following items and any lease awarded in response to the RLP shall reflect and incorporate these remarks or conditions."  AR at 681–84 (plaintiff's initial proposal conditional terms addendum).  Lastly, plaintiff's initial proposal did not mark compliance with item number 33 on form 1364, which stated the following:

> 33.    BY SUBMITTING THIS OFFER, THE OFFEROR AGREES UPON ACCEPTANCE OF THIS PROPOSAL BY HEREIN SPECIFED DATE, TO LEASE TO THE UNITED STATES OF AMERICA, THIS PREMISES DESCRIBED, UPON THE TERMS AND CONDITIONS AS SPECIFIED HEREIN, IN FULL COMPLIANCE WITH AND ACCEPTANCE OF THE AFOREMENTIONED RLP, WITH ATTACHMENTS.
> ☐  I have read the RLP with attachments in its entirety and am requesting no deviations.

AR at 679 (plaintiff's initial proposal).

After reviewing plaintiff's proposal, the government's broker, Megan Shulin, GSA Broker Contractor for Public Properties, LLC, sent plaintiff's broker, Edward Welbourn, CBRE First Vice President, a letter via email on 12 January 2021.  AR at 2664 (Shulin email to Welbourn).  The email stated the GSA was seeking revised proposals, advised Mr. Welbourn to "please see our request and *deficiency letter* attached," and included an attached PDF titled: "6FL0544 *Deficiency Letter* Dolphin Corporate Center."  *Id.* (emphasis added).  The email provided a time for a call "to discuss these deficiencies."  *Id.*  The attached "deficiency letter" stated, among other discussion items:  "Please confirm in which floodzone [sic] property is located."  AR at 1644 (12 January 2021 deficiency letter).  The deficiency letter also identified plaintiff's "additional remarks" addendum as an item for discussion.  *Id.*

On 15 January 2021, the government's broker, Megan Shulin, and contracting officer ("CO"), Kazi Rizvi, conducted a "negotiation call" to discuss the initial proposal with plaintiff's brokers, Edward Welbourn, CBRE First Vice President, and Timothy Hutchens, CBRE Executive Vice President.  AR at 1644, 2664.  Following the call, on 26 January 2021, plaintiff submitted a revised proposal again marking its property as "in a 500-year flood plain," but this time without inclusion of the FEMA map.  AR at 875 (plaintiff's first revised proposal).  Plaintiff's revised proposal also did not revise item numbers 31 and 33 on form 1364, although, like the map, plaintiff left out the addendum.  AR at 874 (plaintiff's revised proposal's item number 31 still stating, "[s]ee additional remarks or conditions included as part of this offer[,]" without the addendum attached, and item number 33 remaining unmarked).

On 1 February 2021, Megan Shulin emailed Edward Welbourn once again, this time requesting "Final Proposal Revisions."  AR at 2667.  The email's subject line stated, "Request for Final Offers," and included a PDF attachment titled:  "6FL0544 Request for FPR_Dolphin Corporate Center."  *Id.*  The attachment advised plaintiff of a "negotiation call . . . scheduled to discuss your revised offer . . . [and] will include a complete review of your revised proposal."  AR at 1650 (1 February 2021 request for FPRs).  The attachment identified one specific discussion item:  "Pricing and concessions to be discussed."  *Id.*  On 9 February 2021, after the negotiation call, plaintiff once again revised its proposal.  AR at 1001 (plaintiff's second revised proposal).  This time, plaintiff indicated its property is "in a base (100-year) flood plain" without including the FEMA map.  AR at 1003.  Plaintiff's second revised proposal again did not revise item numbers 31 and 33 on form 1364, and again left out the "additional remarks or conditions" addendum.  AR at 1002.

On 11 March 2021, GSA issued an amended RLP and requested "Final Offers."  AR at 2671 (Shulin email to Welbourn).  On 18 March 2021, plaintiff submitted its third revised proposal, this time:  indicating its property is "in a base (100-year) flood plain" for the second time, AR at 1009; reintroducing the FEMA map from its initial proposal showing its property in a 100-year flood plain, AR at 1053; leaving item numbers 31 and 33 on form 1364 unchanged from all previous submissions, AR at 1008; and reintroducing the "additional remarks and/or conditions" addendum from its initial proposal, AR at 1010–13.  In sum, plaintiff had four separate opportunities to modify its entire proposal:  (1) the 15 December 2020 initial proposal; (2) the 26 January 2021 opportunity to revise proposals; (3) the final proposal revisions on 9 February 2021; and (4) the revised final proposal revisions on 18 March 2021.

## C.    Plaintiff's Post-Award Submissions

"On [or about] 15 May 2021, GSA's broker, Meg Shulin, informed [plaintiff]'s broker, Edward Welbourn, that GSA considered [plaintiff]'s proposal to be technically unacceptable since its proposed site resided in the 100-year flood plain."  Pl.'s MJAR at 5 (citing AR at 2674 (Welbourn 17 May 2021 email to Shulin following up on a 14 May 2021 phone call)).[1]  On 17 May 2021, plaintiff's broker sent the government's broker two documents:  (1) a 22 January

---

[1] Although plaintiff's MJAR states GSA's broker informed its broker of plaintiff's proposal's unacceptability on 15 May 2021, plaintiff only cites a 17 May 2021 email Welbourn sent Shulin that mentions the email is "[f]ollowing our call on Friday, [14 May 2021]."  Plaintiff received the official notice on 31 May 2021.  Pl.'s MJAR at 6 (citing AR 2344–45 (GAO protest)).

2009 FEMA Letter of Map Revision Based on Fill (LOMR-F), Case No. 09-04-0817A; and (2) an elevation certificate dated 31 January 2019.  AR at 2674–78 (Welbourn 17 May 2021 emails to Shulin); Am. Compl. ¶ 82 (citing Ex. C at 78–86, ECF No. 50-1 (LOMR-F and 31 January 2019 elevation certificate)).  Plaintiff's broker's email stated:  "The lessor informed us[] that the Building is not in either the 100-year or 500-year floodplain and forward[ed] the attached [LOMR-F] to us."  AR at 2674.  The email continued:  "Very excited to be able to inform you that our Offer on behalf of [plaintiff's property] is fully compliant with the requirements of RLP No. 6FL0544 that states the building not be located in the 100 year floodplain."  *Id.*  Upon receiving these documents, the government's broker emailed the CO and stated they sent GSA's Regional Environmental Program Specialist, Ashish Desai, "multiple emails . . . months ago for him to do a [floodplain] check on this property and nothing came back from him."  AR at 2674–75 ("If Ashish had responded to our inquiries to do a floodplain check months ago[,] we wouldn't be blindsided."); *see* Pl.'s MJAR at 5.

Jamie Thompson, Acting Branch Chief for the Florida Leasing Division of the GSA, also received the documents from Megan Shulin on 17 May 2021.  AR at 2675–77.  Mr. Thompson noted the documents were received after the deadline for revised FPRs, and determined they would not have affected the outcome of the lease procurement any way.  *Id.*  The government's broker concurred.  *Id.*  On 26 May 2021, the government awarded the lease to defendant-intervenor.  Def.'s Am. MJAR & Opp'n Protester's MJAR & Mot. PI ("Gov't's Am. MJAR") at 13, ECF. No. 93.  "On 31 May 2021, [plaintiff] received a Notice to Unsuccessful Offeror Letter stating [plaintiff]'s proposal was technically unacceptable since the '[b]uilding location and ingress and egress to the Premises are within the 100-year flood-zone and there has been a practicable alternative identified that can meet the Government's requirements, per RLP Section 2.02.'"  Pl.'s MJAR at 6 (citing AR 2344–45 (GAO protest)).

### D.    Plaintiff's Bid Protests and the Government's Corrective Actions

On 10 June 2021, plaintiff filed a bid protest with the Government Accountability Office ("GAO").  AR at 2335 (GAO protest).  Plaintiff submitted to the GAO the FEMA Revalidation letter ("LOMR") and a 10 June 2021 Rogers Gray Insurance Flood Specialist report to demonstrate its property and the surrounding area is not in a 100-year floodplain.  Pl.'s MJAR at 6–7.  On 7 July 2021, the government filed a notice of corrective action, and on 11 August 2021, the GAO dismissed plaintiff's protest.  *Id.* at 7.  On 13 August 2021, plaintiff filed the bid protest currently pending before the Court.  *See* Compl., ECF No. 1.  On 7 September 2021, the government filed a notice of corrective action to reevaluate proposals and make a new award decision.  *See* Order, ECF No. 26.  "During the course of the corrective action, GSA determined that discussions were not necessary, and it accordingly did not ask offerors to submit revised proposals."  Gov't's Am. MJAR at 14.

On 22 November 2021, plaintiff, unsolicited by either the Court or the government, filed a notice of the documents it submitted to the CO for consideration during corrective action.  *See* Notice, ECF No. 40.  Plaintiff's submission to the government included a letter with nine exhibits "to provide GSA with the necessary data to correctly determine as part of its re-evaluation of offers that [plaintiff]'s proposed [property], as well as vehicular access to and from the [p]roperty, meet the flood plain requirements of the RLP."  *Id.* at 1.  The government

did not consider plaintiff's submission because it determined "reopening discussions and inviting a fifth round of proposal revisions for the corrective action was not necessary." Gov't's Am. MJAR at 15 (citing AR at 2374 (CO memo reaffirming award to defendant-intervenor)). The government reaffirmed its award to defendant-intervenor on 17 January 2022. Gov't's Notice at 2, ECF No. 41. On 21 January 2022, the government sent plaintiff a notice of unsuccessful offeror letter stating plaintiff's proposal was technically unacceptable because of three conditions plaintiff placed on its offer in its "additional remarks and/or conditions" addendum, and because its property is located in a 100-year floodplain. Pl.'s MJAR at 9.

## II.     Procedural History

Following completion of the government's corrective action, on 14 February 2022, the Court entered the parties' proposed briefing schedule. *See* Order, ECF No. 49. Per the briefing schedule, plaintiff filed a first amended complaint on 14 February 2022, ECF No. 50. On 28 February 2022, the government filed the AR, ECF No. 51. On 21 March 2022, plaintiff filed a motion to complete and supplement the AR, ECF No. 53, an MJAR, and a motion for permanent injunction, ECF No. 54. On 4 April 2022, the government filed its response to plaintiff's motion to complete and supplement the AR, ECF No. 59, and on 8 April 2022, the government filed its cross-MJAR and response to plaintiff's MJAR and motion for permanent injunction, ECF No. 63. Also on 8 April 2022, defendant-intervenor filed a motion to dismiss, a cross-MJAR, and a response to plaintiff's MJAR and motion for permanent injunction, ECF No. 64, and plaintiff filed a reply in support of its motion to complete and supplement the AR, ECF No. 60. The Court determined a decision on plaintiff's motion to complete and supplement the AR was necessary before reaching the merits of the parties' cross-MJARs, so the Court stayed the deadlines for the parties' MJAR reply briefs and all briefing on defendant-intervenor's motion to dismiss. *See* Order, ECF Nos. 58, 65.

The Court heard oral argument on plaintiff's motion to supplement the AR on 28 April 2022. *See* Order, ECF No. 68. On 6 May 2022, the Court ordered the government to supplement the AR with plaintiff's GAO protest record "for the limited purpose of deciding whether [plaintiff] timely submitted [GAO] Protest Exhibits I and L[, LOMR-F Case No. 09-04-0817A and the Rogers Gray elevation report, respectively], and whether GSA should have considered them and, if so, following any briefing considering the Court's ruling in that regard, whether their consideration undermines the agency's award decision." *See* Order at 12, 22, ECF No. 82 ("6 May Order") (internal quotations omitted) (quoting JSR at 2, ECF No. 67). The Court also ordered declarations from Edward H. Welbourn IV, Timothy C. Hutchens, Kazi Rizvi, and Megan V. Shulin. *See id.* at 22. The Court, however, denied plaintiff's motion to supplement the AR with the elevation certificate, November letter, and FEMA website screenshots.[2] *See id.* at 12–17, 22. The Court also authorized, but did not require, limited depositions of Mr. Welbourn and Ms. Shulin which were held on 13 May 2022 and 18 May

---

[2] In the 6 May Order, the Court found the elevation certificate, November letter, and FEMA screenshots were not submitted with plaintiff's proposals so they were "not a part of 'the materials that were before the agency when it made its final decision[,]'" and did not "reveal[] the agency's decision-making process." 6 May Order at 14, 16 (citations omitted). The Court concluded these materials would not aid "effective judicial review" and denied supplementing the AR with them. *Id.*

2022, respectively.[3]  *See id.* at 22; Gov't Am. MJAR at 16.  Finally, the Court allowed the government and defendant-intervenor to file amended responses to plaintiff's MJAR and cross-MJARs by 26 May 2022.  *See* 6 May Order at 22.

After the Court's ruling on plaintiff's motion to supplement the AR, on 26 May 2022, defendant-intervenor filed an amended motion to dismiss, cross-MJAR, and response to plaintiff's MJAR and motion for permanent injunction.  Def.-Int.'s Am. Opp'n Pl.'s MJAR & Mot. PI. ("Def.-Int.'s Am. MJAR"), ECF No. 92.  Also on 26 May 2022, the government filed its amended cross-MJAR and response to plaintiff's MJAR and motion for permanent injunction.[4]  *See* Gov't Am. MJAR.  On 9 June 2022, plaintiff filed a reply and response.  Pl.'s Comb. Reply Opp'n Def. & Def.-Int. Pl.'s MJAR & Mot. PI & Pl.'s Comb. Resp. Am. Cross-MJARs Def. & Def.-Int. ("Pl.'s Comb. Reply"), ECF No. 95.  On 28 June 2022, defendant-intervenor filed a reply.  Def.-Int's Reply Br. Opp'n Pl.'s MJAR & Mot. PI ("Def.-Int.'s Reply"), ECF. No. 100.  Also on 28 June 2022, the government filed a reply.  Def.'s Reply Supp. MJAR & Opp'n Pl.'s MJAR & Mot. PI ("Gov't's Reply"), ECF No. 101.  On 10 August 2022, the Court held oral argument on the pending motions, ECF No. 96.[5]  *See* Oral Argument Tr. ("Tr."), ECF No. 109.

---

[3] In its 6 May Order, the Court found "numerous and significant inconsistencies, conflicts, and contradictions currently within the record as it relates to the discussions" the government and plaintiff had about plaintiff's proposals.  6 May Order at 21 (citations omitted).  The Court determined deposition testimony was required "to perform an effective judicial review" and granted supplementation of the AR.  *Id.*  Mr. Welbourn and Ms. Shulin were deposed on 13 May 2022 and 18 May 2022, respectively.  Gov't Am. MJAR at 16.  The government did not file a supplement to the AR following the depositions, so their transcripts are not currently in the AR.  Oral Argument Tr. ("Tr.") at 42:2–43:10 (the parties explaining the deposition transcripts were never filed, the Court responding its "expectation is that they would have been filed," and the parties confirming there is no objection to the Court receiving copies of the full transcripts at the oral argument).  The parties, however, regularly cite and quote the deposition transcripts throughout their cross-MJAR briefing and provided the Court with copies of each deposition transcript at oral argument.  *Id.*; *see also* Tr. at 61:22–62:23 (government counsel providing the Welbourn deposition transcript).  The Court accordingly utilizes the deposition transcripts in reaching its decision in this case and cites to the parties' briefs where reference to the deposition transcripts is necessary.  In accordance with the Court's 6 May Order, for completeness of the AR, the government shall file a supplement to the AR containing copies of both Mr. Welbourn's and Ms. Shulin's deposition transcripts on or before 14 September 2022.  *See* 6 May Order at 21.

Upon review of the Welbourn and Shulin deposition transcripts, the Court confirms they resolve the conflicts on the record regarding the government's discussions with plaintiff.  In her deposition, Ms. Shulin confirmed she "did not direct anybody" to change plaintiff's proposal to indicate its property is within a 100-year floodplain.  Gov't Am. MJAR at 8–9 (quoting Shulin Dep. at 26:3–13).  Contrary to his original declaration, AR at 2842, Mr. Welbourn confirmed in his deposition that he "received the deficiency letter" and "all seven items [in the letter] were discussed on the call[.]"  Gov't Am. MJAR at 7–8 (quoting Welbourn Dep. at 26:22–27:9).  Mr. Welbourn explained the deficiency letter and related discussions led him to revise plaintiff's proposal so "all seven items that were identified were fixed going into the final proposal submissions."  *Id.* at 10 (quoting Welbourn Dep. at 25:16–19 and citing Welbourn Dep. at 26:10–13).  Though he maintains the government directed him to mark the 100-year floodplain box, Mr. Welbourn testified that he read and understood the terms of the solicitation, including RLP § 2.02.  *Id.* at 24; Welbourn Dep. at 22:4–24:4.  Mr. Welbourn explains the failure to improve plaintiff's bid after the discussions as a consequence of the government not informing him the items were "technical deficienc[ies.]"  Welbourn Dep. at 35:17–36:1.

[4] The government and defendant-intervenor confirmed at oral argument they are no longer relying on their original cross-MJARs, ECF Nos. 63, 64, and their amended cross-MJARs are intended as substitutes for the originals.  Tr. at 8:11–18, ECF No. 109.  Accordingly, the Court finds the original cross-MJARs, ECF Nos. 63, 64, are moot.

[5] Prior to oral argument, the government filed a motion to prohibit plaintiff's use of a slide deck demonstrative exhibit as an improper surreply.  As the Court did not use or display plaintiff's slide deck during oral argument, the

## III.    Parties' Arguments

Plaintiff moves for judgment on the administrative record on three primary grounds. *See* Pl.'s MJAR. First, plaintiff alleges the government erroneously determined its proposed property resides within a 100-year floodplain. *Id.* at 10–26. Although plaintiff's own proposal certified its property as within a 100-year floodplain and did not include any documentation to the contrary, plaintiff submits the burden was on the government to correct plaintiff's error. *Id.* Second, plaintiff argues the government failed to conduct meaningful discussions with plaintiff regarding its floodplain status and the conditions contained in its bid. *Id.* at 26–30. Third, plaintiff contends the government treated plaintiff in a prejudicially disparate manner by waiving an RLP floor requirement and accepting defendant-intervenor's fire safety documentation after the February proposal deadline.[6] *Id.* at 31–34. Plaintiff alleges these errors prejudiced it and warrant injunctive relief. Pl.'s MJAR at 35–40.

The government and defendant-intervenor filed amended cross-motions for judgment on the administrative record opposing all of plaintiff's MJAR arguments. *See* Gov't's Am. MJAR; Def.-Int.'s Am. MJAR. The government and defendant-intervenor argue the government did not err, so plaintiff faces no prejudice and is not entitled to injunctive relief. Gov't's Am. MJAR at 41–47; Def.-Int.'s Am. MJAR at 20–32. In addition, defendant-intervenor moves to dismiss plaintiff's bid protest for lack of standing because plaintiff's proposed property is within a 100-year floodplain, so plaintiff did not have a substantial chance of receiving the award. Def.-Int.'s Am. MJAR at 9–11.

## IV.    Standard of Review

---

Court did not refer to plaintiff's slide deck in reaching any decision in this Opinion, and the slide deck is not a properly filed entry on the Court's docket, the government's motion is moot. Accordingly, the Court denies as moot the government's motion to prohibit, ECF No. 102.

During oral argument, the Court reminded the parties of their obligation to file public redacted versions of sealed filings under paragraph 12 of the protective order, ECF No. 17. After oral argument, the parties filed several such public redacted filings. Plaintiff also filed a notice of its objection to defendant-intervenor filing a public redacted version of defendant-intervenor's original cross-MJAR. *See* Notice, ECF No. 107. Plaintiff contends the filing would be unnecessary because defendant-intervenor replaced its original motion with an amended cross-MJAR. *Id.* at 1. Paragraph 12 of the protective order, however, does not make exception for original briefs that are later amended. ¶ 12, ECF No. 17. Rather, the protective order obligates the parties to file public redacted versions of every sealed filing, and plaintiff's objection to defendant-intervenor's duty to do so for its original cross-MJAR presents no principled reason for deviating from the protective order. In federal court, there is a "presumption of public access . . . —and [trial] courts have an independent duty to protect the public's right of access—even when the parties agree to maintain confidentiality of publicly filed information pursuant to a protective order." *DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1370 (Fed. Cir. 2021). While "the public's right of access is not absolute[,]" there is a "presumption that judicial records should be available to the public." *Id.* at 1369 (internal quotations omitted). Plaintiff's objection to the necessity of a public redacted version of defendant-intervenor's original cross-MJAR does not overcome the presumption of public access or the requirements of the protective order. Accordingly, defendant-intervenor shall file a public redacted version of its original cross-MJAR. *See infra* Section VIII.

[6] At oral argument, plaintiff explained it is dropping its disparate treatment arguments regarding defendant-intervenor's property interest in its building. Tr. at 116:15–22. The Court accordingly considers the argument waived and does not address it in this Opinion.

When this Court evaluates a bid protest, "the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *see also Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 711 (2011), *aff'd,* 691 F.3d 1374 (Fed. Cir. 2012). Arbitrary and capricious means "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (cleaned up).

"[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (citation omitted). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To establish prejudice, the protester "must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.* This requirement is satisfied when "but for the government's alleged error, the protestor would have been 'within the zone of active consideration.'" *Preferred Sys. Sols., Inc. v. United States*, 110 Fed. Cl. 48, 57 (2013) (quoting *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37 (2010), *aff'd,* 649 F.3d 1320 (Fed. Cir. 2011)). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard. . . . [T]here is no starting point of presumed prejudice." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).

## V.     Analysis of the Parties' Cross-Motions for Judgment on the Administrative Record

### A.     Whether the GSA's Floodplain Evaluation was Erroneous

Plaintiff argues GSA's determination of its property as residing in a 100-year floodplain "was based on a fundamental misunderstanding of how FEMA records, manages, updates and publishes its floodplain data[,]" constituting an "arbitrary and capricious" agency action. Pl.'s MJAR at 10. In both the 31 May 2021 and 21 January 2022 "Notice to Unsuccessful Offeror" letters, plaintiff notes GSA states plaintiff's property is not technically acceptable because the "Building location and ingress and egress to the Premises are within the 100-year flood-zone[,]" Compl. Ex. B at 114; *see also* AR at 2449, but plaintiff argues "GSA was incorrect both times, as the FEMA information governing Dolphin's site, which Dolphin included in it [sic] proposals, repeatedly informed GSA throughout this procurement that Dolphins [sic] property was not in the 100-year floodplain." Pl.'s MJAR at 10–11. Plaintiff's bid included a FIRM map generated on 13 December 2020 from the official FEMA website which plaintiff argues "went into effect, and was current, on September 11, 2009." *Id.* at 11 (citing AR at 696 ("12086C0267L eff. 9/11/2009")). Plaintiff argues "GSA should have known from this map that FIRM updates adopted in the past eleven years explained that Dolphin's site resided outside of the 100-year floodplain." *Id.* Specifically, plaintiff asserts GSA should have checked "not only the FIRM map for the site, but also any and all LOMRs, LOMAs, and LOMR-Fs that update the FIRM

map" because "any revisions or updates to the FIRM that may have been adopted after September 11, 2009 will not appear on the FIRM map generated by the FEMA website." *Id.* at 11–12 (emphasis removed).

According to plaintiff, "GSA could easily do this using either of two tools on the FEMA website: (1) the NFHL Viewer; or [(2)] the Map Services Center ('MSC')." *Id.* at 12–13. Plaintiff argues these tools would have led GSA to "a LOMR-F which states that Dolphin's building no longer resides in the 100-year floodplain." Pl.'s MJAR at 18. Plaintiff asserts "GSA improperly used the very tool it voluntarily chose to use in its evaluation, by failing to use this updated information that was staring it in the face at the precise time it evaluated Dolphin's proposal." Pl.'s Comb. Reply at 34. The LOMR-F states:

> This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Revision based on Fill for the property described above. Using the Information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document revises the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply.

Pl.'s MJAR at 18 (quoting Ex. V, ECF No. 50-1 at 230) (emphasis removed).

Plaintiff also argues "Dolphin provided GSA with three different FEMA elevation certificates, all signed by licensed State of Florida surveyors, which demonstrate that Dolphin's parking lot is outside of the 100-year floodplain." *Id.* at 19. Plaintiff states it "provided to GSA, as an exhibit to its GAO protest and to CBRE's November 22, 2021 letter, a report authored by Mr. Joe Rossi, the Flood Specialist for Rogers and Gray Report Insurance," demonstrating "Dolphin's parking lot is located outside of the 100-year floodplain." *Id.* at 20. Plaintiff claims GSA similarly disregarded its evidence showing ingress and egress "have not been and will not be impacted by flooding on adjacent properties." *Id.* at 21. When GSA did conduct "Eleventh-Hour Floodplain Analysis," plaintiff argues GSA did not properly view the LOMR and was based on incorrect maps. *Id.* at 24–26. Plaintiff asserts it provided Ms. Shulin with the LOMR-F and elevation certificate two days after GSA informed plaintiff its proposal was technically unacceptable, but Ms. Shulin "did not forward the LOMR-F or Elevation Certificate to GSA's expert for review, which was standard practice at that time[,]" and thus did not "ascertain the actual import of the FEMA documents[.]" Pl.'s Comb. Reply at 29.

Plaintiff reject's the government's argument stating "the Agency was under no obligation to dig through the FEMA website to cobble together a compliant proposal for Dolphin's property." *Id.* at 35. First, plaintiff argues "Dolphin adhered to the RLP instructions and checked a box on GSA Form 1364 to indicate its floodplain designation" and "[n]o more was required of Dolphin[.]" *Id.* at 36. Second, plaintiff notes "GSA did not have to scour FEMA databases to construct a compliant offer for Dolphin[,]" but rather all it needed to do was "use[] the tools it voluntarily chose to use to evaluate proposals[.]" *Id.* Third, plaintiff claims GSA's

structuring of the procurement as checking a box to indicate floodplain status means "GSA *chose* to bear the burden of verifying that designation by conducting its own floodplain checks in this procurement." *Id.* Plaintiff notes the tools "produce results in both pictorial *and* textual format" and therefore "Defendant's and Imperium's argument that GSA could consult *only part of the analysis* produced by its chosen evaluation tools, and use these incomplete results to evaluate proposals, describes arbitrary and capricious conduct." Pl.'s Comb. Reply at 37. Finally, plaintiff argues, "to the extent that Defendant and Imperium claim that scouring websites or going on fishing expeditions may have been necessary to recognize Dolphin's proposal as compliant, these activities were made so by GSA's errors, and not those of Dolphin." *Id.* Plaintiff highlights "GSA did not designate Dolphin's proposal solely on the basis of the map Dolphin submitted with its offer, but on three floodplain checks GSA had conducted itself prior to initial discussions." *Id.* at 37–38. "Had GSA conducted a reasonable procurement," plaintiff concludes, "Dolphin would have provided the evidence of its compliance before the deadline for proposal submittal." *Id.* at 38.

The government argues "a majority of Dolphin's arguments rely on documents that are outside the administrative record." Gov't Am. MJAR at 19. The government argues plaintiff's case is untimely because it "appears to have had many of the extra-record documents upon which it now relies[.]" *Id.* at 20. The government asserts "[t]here is no obligation on the agency to scour FEMA's website and maps to determine whether Dolphin's own statements concerning its location in a floodplain were correct." *Id.* "Even within a single proposal," the government notes, "this Court has held 'that an agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place,' let alone sift through Government websites and databases to do so." *Id.* at 21 (quoting *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110 (2013)) (internal citations omitted). According to the government, "it is the offeror's obligation to provide a complete proposal to the agency that allows the agency to evaluate the proposal as written." *Id.* (citing *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)). "Although Dolphin now complains that GSA could have disproven that assertion [of 100-year floodplain status] had it only scoured FEMA's website," the government asserts "Dolphin offers little explanation for its decision to mark the floodplain box on its Form 1364, and no explanation whatsoever for its own failure to provide GSA with the FEMA maps it now contends GSA should have uncovered for itself." Gov't Am. MJAR at 21–22. The government notes "Dolphin's argument ignores the fact that it failed to produce these same documents as part of the proposal and fails to recognize that, based on the proposal submitted by Dolphin, GSA's evaluation was imminently reasonable." Gov't Reply at 11. Further, the government argues "Dolphin only submitted two screenshots, *not live maps*," as floodplain documentation, neither of which contained the "'layer function' that Dolphin now claims is critical" for locating the LOMR-F. *Id.* at 11, 12 (emphasis added). "There was no need," according to the government "for GSA to dig deeper into the FEMA maps, poke around with other features, or conduct any further inquiries because the maps provided by Dolphin matched both Dolphin's proposal and GSA's independent review." *Id.* at 12.

The government also argues "Dolphin's insistence that the agency should have taken steps that Dolphin itself failed to take is all the more unreasonable given that Dolphin's FEMA revalidation letter, . . . effective September 11, 2009, makes clear that FEMA would not

independently advise stakeholders of changes to the map." Gov's Am. MJAR at 23 (citing ECF No. 40-3 at 1). The FEMA letter explains:

> Because these LOMCs will not be printed or distributed to primary map users, such as local insurance agents and mortgage lenders, your community will serve as a repository for this new data. We encourage you to disseminate the information reflected by this letter throughout your community so that interested persons, such as property owners, local insurance agents, and mortgage lenders, may benefit from the information.

ECF No. 40-3 at 1. The government claims "upon receipt of this letter, Dolphin was on notice that the responsibility to advise any interested party of the updated information—which naturally would include a procuring agency—would be on Dolphin, not FEMA or the procuring agency." Gov's Am. MJAR at 23. The government notes "[t]his is consistent with GSA's Floodplain Management Desk Guide, FAQ #12, which explains that the burden of obtaining such documents is on landowners, not the agency." *Id.* (citing AR at 2652). Critically, the government also emphasizes "Dolphin has not presented a cogent explanation for why, if it believed that its parcel was not actually in a floodplain, it consistently marked its Form 1364 as though its building was in a floodplain." *Id.*

The government argues GSA properly evaluated the FEMA maps provided by Dolphin in its 18 March 2021 final revised proposal finding "Dolphin's building was located in a 100-year floodplain, including all ingress and egress points." *Id.* at 26 (citing AR at 2426). As for whether a floodplain check should have been conducted, the government argues "nothing in GSA's floodplain management policy or practice required Mr. Desai to conduct a floodplain check prior to the end of the procurement." *Id.* at 27 n.9 (citing Shulin Dep. at 36:18–22). "Dolphin's real objection to GSA's floodplain determination[,]" the government explains, "is that the agency did not consider the additional untimely documents Dolphin submitted after FRPs." Gov's Am. MJAR at 28. The government continues, "[g]iven that GSA did not conduct additional discussions or allow additional revisions after March 18, 2021, it was entirely proper for the agency to not consider these documents" as per FAR 15.208(b)'s "late-is-late rule" and FAR 15.307(d)(3)'s "improper discussions rule[.]" *Id.*

"[E]ven if the agency had considered the LOMR-F that Dolphin claims is critical to showing its property is outside of a 100-year floodplain[,]" the government argues the LOMR-F would not have aided plaintiff because "[t]he LOMR-F only covers the *building*, it does not address the ingress and egress of the building and does not cover the parking lot." Gov's Reply at 15 (citing ECF No. 50-1 at 150). The government notes "GSA's floodplain management desk guide" states "a LOMR-F that does not cover the entire parcel offered cannot lift an offeror's property out of the floodplain." *Id.* at 15–16. The government also emphasizes the "Desk Guide precludes the agency from deviating from the FEMA determinations or map designations" and any disagreement from the landowner must be discussed with FEMA, not GSA. *Id.* at 16 (citing AR 2652). The government concludes "there was no prejudice to Dolphin from GSA's decision not to evaluate these additional documents because these documents do not demonstrate that Dolphin was the lowest priced technically acceptable offeror." *Id.*

Imperium similarly argues "[d]espite knowing that offering a property within a floodplain would render its offer technically unacceptable, Dolphin indicated in both its FPR and revised FPR that its property is located within a 100-year floodplain." Def.-Int.'s Am. MJAR at 13 (citing AR at 1003, 1009). Imperium also asserts the maps plaintiff included in its proposal "show that Dolphin's building is entirely located within the 100-year floodplain, including all ingress and egress points." *Id.* (citing AR at 2426). "Dolphin's brief," according to Imperium, "goes through pages and pages of exercises it alleges that the GSA should have conducted to come to the conclusion that Dolphin's property is not in a floodplain, even though Dolphin's FPR and revised FPR plainly state that Dolphin's property is within a 100-year floodplain and the maps submitted with its offer confirm the same." *Id.* Imperium argues "there is no requirement for the Agency to conduct a fishing expedition to confirm whether an offered site designated as being in a floodplain by the offeror is indeed in a floodplain." *Id.* at 14. "Furthermore," Imperium argues, "pursuant to GSA Floodplain Management Desk Guide, the contracting officer conducted his own determination and consulted with GSA Regional Environmental Program Specialist and confirmed that the ingress and egress to Dolphin's property are located within a 100-year floodplain." *Id.* (citing AR at 2429–33). Imperium also criticizes plaintiff's reliance on the LOMR, stating "LOMRs are used for insurance purposes in that they eliminate the federal flood insurance purchase requirement as a condition of federal or federally backed financing, which has no bearing on whether a property resides in a floodplain for purposes of this procurement." Def.-Int.'s Am. MJAR at 14–15 (footnote omitted). Imperium further argues "the LOMR only applies to Dolphin's building and does not pertain to the ingress and egress of same." *Id.* at 15. Imperium concludes "the LOMR, even if it were included as part of the administrative record, would be immaterial to the contracting officer's proper determination, in his sole discretion, that the ingress and egress to Dolphin's property are located within a 100-year floodplain." *Id.*

Section 2.02 of the amended RLP states "[a] Lease will not be awarded for any offered Property located within a 100-year floodplain unless the Government has determined that there is no practicable alternative." AR at 1933 (RLP § 2.02). Section 2.02 further states "a Lease will not be awarded for any offered Property adjacent to [a] 100-year floodplain, where such an adjacency would, as determined by the [lease contracting officer], in his or her sole discretion, restrict ingress or egress to the Premises in the event of a flood, unless there is no practicable alternative." *Id.* Each offeror, as a part of its proposal, was required to indicate whether its property was: (1) "in a base (100-year) flood plain"; (2) "in a 500-year flood plain"; or (3) "not in a flood plain." AR at 636 (form 1364 within a sample lease proposal form for the RLP).

The government "is entitled to rely on [the] certification[s]" in an offeror's proposal when "determining whether to accept a bid[.]" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011). "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996). Contract rescission "is not available for an 'errant bid' caused by a bidder's 'gross negligence in failing to read and consider the specifications thoroughly.'" *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1366 (Fed. Cir. 2021) (quoting *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed. Cir.

1987)).  Offerors are responsible for submitting well-written and adequately detailed proposals; failure to do so is chargeable to the offeror alone.  *Structural Assocs.*, 89 Fed. Cl. at 744.

Plaintiff now contends its property does not reside within a floodplain, but none of its bid proposals reflect this.  *See* AR at 680, 875, 1003, 1009.  Plaintiff's first proposal, dated 15 December 2020, indicates the property is "in a 500-year flood plain."  AR at 680.  Plaintiff's second proposal, dated 26 January 2021, similarly indicates a "500-year flood plain" status for the property.  AR at 875.  The third proposal submitted 9 February 2021, however, changes the floodplain status to "a base (100-year) flood plain."  AR at 1003.  Plaintiff's final 18 March 2021 proposal, which the government relied on in making its award decision, also indicated the property is in a 100-year floodplain.  AR at 1009.  On *four* occasions plaintiff indicated its property resides in a floodplain, and *twice* indicated it resides in a 100-year floodplain.  *See* AR at 680, 875, 1003, 1009; Tr. at 16:12–18:12 (plaintiff's counsel agreeing on these facts).  Welbourn, plaintiff's broker, testified "that he read the RLP and understood that GSA would not award a lease for any offered property located within a 100-year floodplain unless the Government had determined that there was no practicable alternative under Section 2.02[.]"  Tr. 16:12–19.  Despite this understood risk of exclusion, plaintiff twice submitted its property as residing in a 100-year floodplain.  *See* AR at 680, 875, 1003, 1009.  At oral argument, plaintiff's counsel characterized Welbourn's mistake stating "[h]e checked the 100-year box . . . [and i]t turned out to be the wrong box . . . ."  Tr. at 81:2–8; *see also* Tr. at 39:11–23 (plaintiff's counsel stating Welbourn selecting 100-year floodplain was "an error on his part").  It is unclear when Welbourn, plaintiff's broker, became aware plaintiff believed its property is outside the floodplain and the proposal may be in error.  Tr. at 36:8–18 (plaintiff's counsel stating he does not think Welbourn was aware of the correct floodplain status in January).  Plaintiff checking "the wrong box" and failing to consider the import of the RLP conditions are plaintiff's own mistakes, not the governments.  *Id.*; *see Asset Prot. & Sec. Servs., L.P.*, 5 F.4th at 1366 (denying relief "for an 'errant bid' caused by a bidder's 'gross negligence in failing to read and consider the specifications thoroughly'" (quoting *Liebherr Crane Corp.*, 810 F.2d at 1157)).  GSA was "entitled to rely on" these floodplain status representations when "determining whether to accept [plaintiff's] bid[.]"  *See Allied Tech.*, 649 F.3d at 1330.

Not only did plaintiff check the "100-year flood plain" box in its last two proposals, but it included a FEMA map indicating its property is within the 100-year floodplain.  *See* AR at 1003, 1009, 1053.  At oral argument, plaintiff agreed this map shows the property itself and the ingress and egress points are all within the 100-year floodplain.  Tr. at 78:12–83:8 (plaintiff's counsel agreeing the map shows the property in a 100-year floodplain but explaining the government should have checked for updates to the map not submitted in plaintiff's bid).  Plaintiff contends, however, GSA should have looked not only at the "pictorial part of the map" but also the text which states:

> The flood hazard information is derived directly from the authoritative NFHL web services provided by FEMA.  This map was exported on 12/13/2020 at 8:50 PM and does not reflect changes or amendments subsequent to this date and time.  The NFHL and effective information may change or become superseded by new data over time.

- 14 -

AR at 1053.  Plaintiff argues the government should have read this warning in the map plaintiff provided and then searched FEMA's website for updates to plaintiff's provided map.  Pl.'s Comb. Reply at 25–27.  Had the government done so, plaintiff states the government would have uncovered a LOMR allegedly removing its property from the 100-year floodplain.  *Id.*  The letter states:

> Because these LOMCs will not be printed or distributed to primary map users, such as local insurance agents and mortgage lenders, your community will serve as a repository for this new data. We encourage you to disseminate the information reflected by this letter throughout your community so that interested persons, such as property owners, local insurance agents, and mortgage lenders, may benefit from the information.

ECF 50-1 at 220; *see also* 6 May Order at 12–15 (denying supplementation of the AR with this letter).  Although the letter was not included with any of plaintiff's four proposals and is not in the AR, the letter demonstrates how plaintiff failed to provide the requisite information to show its property is outside a 100-year floodplain.  *ST Net, Inc.*, 112 Fed. Cl. at 110.  Plaintiff failed to "disseminate the information reflected by this letter[,]" ECF 50-1 at 220, to the government and consequently failed to submit a "well-written proposal."  *Structural Assocs.*, 89 Fed. Cl. at 744.  In *Structural Associates*, this court noted, "[p]laintiff's failure to provide more detailed information is chargeable to it alone."  *Id.* (citation omitted).  Plaintiff blames the government for its incomplete bid by claiming it did not know the error would cause a deficiency, but plaintiff should have submitted a complete and accurate bid at the onset.  *See Allied Tech.*, 649 F.3d at 1330; Tr. at 83:12–86:17 (plaintiff's counsel stating it did not "conduct a proper floodplain analysis" or include this letter in any of its proposals).

Even if the government had conducted the floodplain analysis unsupported by plaintiff's proposal, the government's floodplain determination would remain unchanged.  *See* AR at 2652; ECF 50-1 at 231.  The LOMR plaintiff claims removed its property from the 100-year floodplain explicitly states only the structure was removed from the floodplain, *not* the entire property.  *See* ECF No. 50-1 at 230 (indicating "WHAT IS REMOVED FROM THE SFHA" is the "*Structure* (Commercial)" (emphasis added)), 231 ("Portions of this property . . . may remain in the Special Flood Hazard Area.  Therefore, any future consideration or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management.").  The GSA Desk Guide states, "the LOMA or LOMR should account for the property and the building.  If the LOMA or LOMR only account for the building, GSA must consider the *whole property as in the floodplain*."  AR at 2652 (emphasis added).  Accordingly, if GSA had located and considered the LOMR, per the Desk Guide, it would have still assessed plaintiff's property as being in the 100-year floodplain because only the *structure* was removed from the floodplain, not the ingress, egress, or parking.  *See* AR at 2652; ECF No. 50-1 at 230–31.  The government explained the LOMR by noting the structure is on stilts to lift it out of the floodplain and decrease flood insurance costs, but other portions of the property remain in the floodplain per FEMA.  Tr. at 109:9–21.  Plaintiff maintained its disagreement with FEMA's determination that portions of the property remain in the floodplain, relying on an elevation certificate not submitted with any proposal or included in the AR.  Tr. at 100:11–104:2; 6 May Order at 12–15.  If plaintiff took issue with FEMA's floodplain determination, however, the

GSA Desk Guide provides "it is the landowner's responsibility to consult with FEMA to request a change to the floodplain determination (Letter of Map Amendment [LOMA] or Letter of Map Revision [LOMR]). *GSA should not participate in this process as it is the landowner's responsibility*." AR at 2652 (emphasis added). Plaintiff neither requested such a change from FEMA nor provided the requisite proposal information to show its property is outside a 100-year floodplain. Rather, plaintiff submitted a proposal indicating its property is in the 100-year floodplain and inadequate information to demonstrate the contrary. The consequences for these mistakes are chargeable to plaintiff alone. *See Allied Tech.*, 649 F.3d at 1330; *Structural Assocs.*, 89 Fed. Cl. at 744.

    Plaintiff finally argues a 24 March 2020 elevation certificate and a Rogers Gray expert report show plaintiff's property is outside the 100-year floodplain. Pl.'s Comb. Reply at 28–31. It is undisputed plaintiff did not submit either document with any of its proposals, however, so the government did not consider them in making its award decision. *Id.* Plaintiff also admitted it does not know whether or where the government could have found the elevation certificate on its own, but that certificate was crucial to showing plaintiff's property was not in a 100-year floodplain. Tr. 106:9–108:16. The Rogers Gray expert report is dated 12 November 2021, and was accordingly not in existence at the time plaintiff submitted its proposals. ECF No. 40-4. Both documents were excluded from the administrative record in the Court's 6 May Order. 6 May Order at 15. In excluding both documents from the AR, the Court explained the government could not have considered either document without violating the FAR and engaging in improper discussions. *Id.* at 13–14. If plaintiff wanted the government to consider the elevation certificate or expert report, plaintiff should have included them with its many proposals. *Allied Tech.*, 649 F.3d at 1330; FAR § 15.307(b) (2014); *Dubinsky v. United States*, 43 Fed. Cl. 243 (1999) (analyzing "improper discussions" under FAR § 15.307(b)); *see infra* Section V.B.3 (discussing whether the government should have reopened discussions on corrective action and accepted plaintiff's late-submitted documents).

    Plaintiff fails to show the government's floodplain analysis of plaintiff's proposal was arbitrary and capricious. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *see also Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 711 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012). The government's floodplain determination does not "run[] counter to the evidence before the agency[.]" *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009). Plaintiff's own proposal indicated its property is in a 100-year floodplain. *See* AR at 680, 875, 1003, 1009. Plaintiff's proposal included a map showing its property, ingress, and egress are located in a 100-year floodplain. *See* AR at 1003, 1009, 1053. Plaintiff places the responsibility for its inadequate proposal on the government and argues the government should not have relied on the information plaintiff provided. Pl.'s Comb. Reply at 25–31. Plaintiff does not cite any authority to support its assertion the government had a duty to investigate plaintiff's floodplain status and change plaintiff's bid to render plaintiff eligible for award. *Id.* at 35–38. Even if the government conducted the floodplain analysis plaintiff did not conduct, and located the LOMR plaintiff argues for, the LOMR would not have altered the government's floodplain determination. *See* AR at 2652; ECF No. 50-1 at 230–31. Plaintiff's other documents are outside the AR and were not before the agency when it made its award decision. *See* 6 May Order at 13–14. Regarding the government's floodplain determination, plaintiff accordingly fails to carry its "heavy burden of showing that the award

decision had no rational basis." *Allied Tech.*, 649 F.3d at 1326 (internal quotations omitted) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).

### B. Whether the GSA's Discussions Were Meaningful

#### 1. Floodplain Requirement

Plaintiff argues "GSA failed to conduct meaningful discussions with Dolphin because GSA never advised Dolphin of the Agency's technical unacceptability determination or any such concerns, and GSA also failed to provide Dolphin with an opportunity to address and cure the alleged deficiency." Pl.'s MJAR at 27. Governing law, according to plaintiff, required GSA "to notify Dolphin . . . that the Agency considered Dolphin's proposal deficient due to its purported location in the 100-year floodplain." *Id.* (citing *Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 355 (2017) ("When a proposal involves a deficiency, significant weakness, or adverse past performance information, discussions about those issues must be 'meaningful.'")). Plaintiff argues "GSA grossly violated this rule by continuing to engage in discussions with Dolphin after concluding that Dolphin's proposal was technically unacceptable, but never advising Dolphin" of this. *Id.* Plaintiff claims its argument does not rely on the lack of use of the term "deficiency," but rather "that GSA never conveyed to Dolphin—*using any combination of words*—that . . . Dolphin's offer would be rendered technically unacceptable . . . ." Pl.'s Comb. Reply at 16. Plaintiff claims "the first time GSA informed Dolphin of any issues or deficiencies with its proposal was on May 15, 2021[,]" Pl.'s MJAR at 28, even though "as early as initial discussions GSA had already determined on three separate occasions that Dolphin's site resided within the 100-year floodplain" and "the [a]gency had already twice determined that Imperium's site resided outside of the 100-year floodplain," Pl.'s Comb. Reply at 7 (internal citations omitted).

Plaintiff rejects the government's argument regarding the labeling of the 12 January 2021 letter as a "Deficiency Letter" because "nothing in the substance of the discussions letter informed Dolphin that GSA considered its proposal to be deficient or otherwise ineligible for award." Pl.'s Comb. Reply at 3 (citing AR at 2664, 1644). The "Negotiation Discussion Item" for the floodplain issue "merely request[ed] that Dolphin '[p]lease confirm in which floodzone property is located[,]'" which only "flagged" the issue and did not constitute a deficiency. *Id.* at 4 (quoting AR at 1644; then quoting Shulin Dep. at 30:8). Regarding the 15 January 2021 discussions call, plaintiff claims the same. *Id.* at 3 (citing Shulin Dep. at 28:5–6 ("I never told them they were technically deficient.")). Plaintiff emphasizes Shulin "testified that she could *not* notify Dolphin of any deficiencies in its proposal during or after discussions since it was 'too soon' to do so, as she believed that deficiencies could only be assessed after the submission of final proposals." *Id.* at 6 (citing Shulin Dep. at 28:5–9). Plaintiff deems this "non-sensical" because "[i]f agencies could only diagnose deficiencies after final proposal submittal, pre-award discussions would never occur, and offerors would never receive a chance to revise or improve their proposals as a result of discussions" which "renders FAR 15.306 meaningless." *Id.* (citations omitted). "Dolphin's proposal could only be deemed technically unacceptable for award if Dolphin's site resided in the *100-year* floodplain *and* another offeror's site was outside of the 100-year floodplain and was otherwise responsive[,]" plaintiff contends. Pl.'s Comb. Reply at 14. Plaintiff also argues "Dolphin *only* changed its proposal to state that its site resided

in the 100-year floodplain [as opposed to the 500-year floodplain] after GSA told Dolphin during discussion that the Agency had determined Dolphin's site resided within the 100-year floodplain" but "GSA *never told* Dolphin that doing so would render its offer seemingly deficient[.]"  *Id.* at 14–15.

According to plaintiff, "Dolphin easily could have made [the necessary] demonstrations if GSA notified Dolphin" of its concerns because "as soon as Dolphin learned of the Agency's determination . . . Dolphin submitted to GSA the FEMA LOMR that governs Dolphin's proposed site and Elevation Certificate which unequivocally state that Dolphin's building does not reside in the 100-years [sic] flood plain."  Pl.'s MJAR at 28 (citing AR at 2843 (Welbourn Decl. ¶ 12); Compl. Ex. C at 1–4, ECF No. 1).  This information, plaintiff emphasizes, was provided to GSA "within forty-eight hours[.]"  Pl.'s Comb. Reply at 7 (emphasis removed).

The government does not dispute the agency was required to conduct discussions with plaintiff on the floodplain use but instead contends the discussions were meaningful.  Tr. at 16:1–11.  The government first argues plaintiff cannot claim discussions were not meaningful because "GSA asked Dolphin to confirm the location of the building during the first round of discussions and to correct any deficiencies."  Gov't Am. MJAR at 30.  The 12 January 2021 letter "clearly notified Dolphin that [GSA] had an issue with its proposal concerning the floodplain and directly asked Dolphin to confirm which of the three categories in the flood plain section" the property was located in, and "Dolphin was given the opportunity to discuss the topic during the January 15, 2021 call[.]"  *Id.*  Second, the government notes "not only did GSA notify Dolphin of multiple deficiencies within Dolphin's proposal, including the floodplain, it also provided Dolphin with the opportunity to discuss these deficiencies with the Government twice."  *Id.* at 31.

The government argues GSA was not obligated by law or the FAR "to continue raising issues during discussions."  Gov't Am. MJAR at 31.  Even if it were obligated, the government asserts "Dolphin cannot demonstrate that it was prejudiced by the Government not raising the floodplain issue during the second round of discussions" because "Mr. Welbourn has admitted that Dolphin considered all of the deficiencies identified in the first round of discussions throughout each iteration of its proposal revisions . . . ."  *Id.* at 32 (citing Welbourn Dep. at 25:16–19).  According to the government, "the record demonstrates that Dolphin only changed its proposal with respect to the floodplain after the second round of discussions[,]" noting in plaintiff's initial and first revised proposal, plaintiff marked "500-year floodplain," but in its February and March proposals, "Dolphin revised its proposal to mark its building as located in the base (100-year) floodplain."  *Id.* (citing AR at 680, 875, 1003, 1009).

Finally, the government states "any argument that the Government did not hold meaningful discussions because the Government did not use the term 'deficiency' in the text of its January 15, 2021 deficiency letter or during discussions is without merit."  *Id.* at 33.  The term "deficiency," according to the government, is not required by "FAR subpart 15.6 nor the case law defining 'meaningful discussions[.]'"  *Id.* (quoting *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 734 (1987), *aff'd*, 854 F.2d 464 (Fed. Cir. 1988)) (internal quotations omitted).  The government emphasizes the case law contains "very few affirmative requirements for discussions[.]"  Gov't Reply at 3 (quoting *CRAssociates, Inc. v. United States*, 102 Fed. Cl.

698, 716 (2011), *aff'd*, 475 F. App'x 341 (Fed. Cir. 2012)).  "[E]ven if the Government did not specifically label the floodplain issue a 'deficiency,'" the government argues, "the RLP terms made clear that a building that was within a 100-year floodplain would be viewed as deficient because it would be considered ineligible for award if there was a practical alternative[,]" and plaintiff understood this provision of the RLP.  Gov't Am. MJAR at 33–34 (citing Welbourn Dep. at 23:20–24:4).  The government points to plaintiff's response after the first round of discussions, noting "Mr. Welbourn testified that in response to [the 12 January 2021] letter . . . , Mr. Welbourn amended Dolphin's proposal to address the floodplain issue as part of ensuring that he addressed each deficiency listed . . . ."  *Id.* at 34 (citing Welbourn Dep. at 25:16–19, 26:10–13).  The government concludes this proves "Dolphin understood the issue to be significant[,]" and, "[a]s such, Dolphin cannot now suggest that the discussions concerning the floodplain were not meaningful."  *Id.*  Plaintiff "cherry picking statements" from Shulin's deposition "to contend that she never told Dolphin its proposal was technically deficient[,]" according to the government, is insufficient to show no meaningful discussions occurred because it fails to take into account Welbourn's response and subsequent revision of the proposal.  Gov't's Reply at 2.  The government argues "GSA thus clearly identified the discrepancy between Dolphin's proposal and its own check to allow Dolphin a change to review and revise its proposal.  In response, Dolphin revised its proposal to address GSA's concerns."  *Id.* at 5–6.  According to the government, plaintiff even "concedes[] the test is whether the offeror was given an opportunity to revise its proposal based on the discussions."  *Id.* at 6–7 (citing Pl.'s Comb. Reply at 6).

Imperium also asserts "GSA conducted meaningful discussions with Dolphin regarding the floodplain issue."  Def.-Int.'s Am. MJAR at 16.  Imperium notes "Dolphin was asked to confirm which flood zone its property is located within, and this issue was discussed on a call between GSA and Dolphin on January 15, 2021."  *Id.* at 16–17 (citing AR at 1644).  Imperium continues, "[f]ollowing this discussion, Dolphin admits to *changing* its FPR on February 9, 2021 to reflect that its property is located within a 100-year floodplain, then *reconfirming* that submission in its revised FPR on March 18, 2021."  *Id.* at 17.  Regarding Ms. Shulin's testimony, Imperium argues "[p]laintiff mischaracterizes Ms. Shulin's testimony because . . . Ms. Shulin confirmed that GSA sent Dolphin a letter clearly marked as a 'Deficiency Letter' that contained items of discussion that GSA considered deficiencies."  Def.-Int.'s Reply at 1 (citing Shulin Dep. at 17:21–18:1; 49:7–18).  "Dolphin's arguments," according to Imperium, "are premised entirely on the fact that GSA never used the magic word 'deficient'—or a variation thereof."  *Id.* at 1–2.  Imperium notes GSA's letter is "CLEARLY marked as a 'Deficiency Letter'" and it is "utterly ridiculous" to suggest this "somehow failed to put Dolphin on notice . . . ."  *Id.* at 3.

Imperium emphasizes FAR § 15.306(d)(3) requires an agency to "identify" deficiencies, but the agency does not have to "spoon-feed" an offeror.  *Id.* at 2 (first quoting *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 608 (2022), then quoting *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001)).  Imperium notes the "Solicitation terms themselves put Dolphin on notice[,]" and "[i]t is entirely unsubstantiated for Dolphin to suggest that, when GSA pointed out to Dolphin that its building resides within 100-year floodplain [sic], the Agency was ALSO required to tell Dolphin that this means that Dolphin's proposal would be considered technically unacceptable unless GSA had no practicable alternative."  *Id.*  Imperium contends "Dolphin read the RLP terms and should have been capable of understanding the ramifications of an Agency

determination that Dolphin's building resides within a floodplain." Def.-Int.'s Reply at 2. Imperium lastly argues "GSA did not owe Dolphin information concerning GSA's assessment of Dolphin's competition vis-à-vis the floodplain, or any other potential competitive advantage of other offers." *Id.* at 3. Imperium further criticizes plaintiff's argument, stating plaintiff "invoke[s] NO caselaw or Federal procurement statute for the proposition that GSA owed competitor site information to Dolphin during meaningful discussions." *Id.*

FAR § 15.306(d)(3) puts forth the relevant regulatory standard for discussing deficiencies:

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

FAR § 15.306(d)(3). Discussions are deemed meaningful when "they generally lead offerors into the areas of their proposals requiring amplification or correction[.]" *WorldTravelService*, 49 Fed. Cl. at 439 (quoting *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000)) (internal quotations omitted). The meaningful discussion requirement "does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." *Id.* at 439–40 (citation omitted). The government is not required to use "the word 'deficiency' or 'weakness'" for discussions to be meaningful. *CACI Field Servs., Inc.*, 13 Cl. Ct. at 734.

The Court must first address whether GSA's discussions with plaintiff were enough to "indicate . . . deficiencies," FAR 15.306(d)(3), or to "generally lead [plaintiff] into the areas of their proposal[] requiring amplification or correction[.]" *WorldTravelService*, 49 Fed. Cl. at 439. The government emphasizes, and plaintiff admits, the 12 January 2021 email from Shulin to Welbourn states, "please see our request and *deficiency letter* attached. I've blocked off some time . . . to discuss these *deficiencies*" with an attachment labeled "6FL0544 *Deficiency Letter* Dolphin Corporate Center." AR at 2664 (emphasis added); Tr. at 19:1–23:5 (plaintiff's counsel agreeing on the contents of this email but arguing the attachment that is titled and described as a "deficiency letter" "is not a deficiency letter"). The attached letter enumerates seven "Negotiation Discussion Items" and "Notes/Comments" for each—item two states, "[p]lease confirm in which floodzone [sic] property is located" but does not include the term "deficiency." AR at 1644. The term "deficiency," however, is not required to find discussions are meaningful. *See CACI Field Servs., Inc.*, 13 Cl. Ct. at 734–35; Tr. at 44:19–45:5 (plaintiff's counsel acknowledging the Court's quotation of this case); Pl.'s Comb. Reply at 16 (agreeing the government did not have to use the word "deficiency"). In *CACI*, the Court of Federal Claims held, and the Federal Circuit affirmed, discussions were meaningful under the FAR despite the CO's use of the term "clarification" rather than "deficiency." *CACI Field Servs., Inc.*, 13 Cl. Ct.

at 734; *contra Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 656 (2018) ("[A]sking that offerors confirm the availability of key personnel and extend the validity of their proposals does not constitute discussions."). The court found the plaintiff "should have realized the clear import of the CO's information requests and questions—that there were several informational, if not technical, defects in [plaintiff]'s proposal." *CACI Field Servs., Inc.*, 13 Cl. Ct. at 734. The court concluded, "[w]hile the court agrees with [plaintiff] that more could have been done to communicate the [g]overnment's concerns, the level of discussions was, given the legal threshold, adequate." *Id.* at 732.

The 12 January 2021 email, different from the communications in *CACI*, uses the term "deficiency" three times to describe the attached "Deficiency Letter." AR at 2664. Similar to the facts in *CACI*, however, the letter itself does not internally use the term "deficiency" but still alerts plaintiff to the floodplain issue by marking it as a discussion topic and noting, "[p]lease confirm in which floodzone [sic] property is located." AR at 1644. Welbourn responds to Shulin's email request to schedule a call "to discuss these deficiencies" by confirming her proposed time "works for us." AR at 2664. On the 15 January 2021 call, which was scheduled to "discuss these deficiencies," the parties discussed the floodplain issue as contemplated by the email attachment titled "6FL0544 *Deficiency Letter* Dolphin Corporate Center." AR at 2664 (emphasis added); *see also* Welbourn Dep. at 26:22–27:9. Despite these communications, plaintiff fervently contends Welbourn was unaware, and the government failed to indicate, plaintiff's proposal contained any deficiency or weakness. Tr. at 32:8–35:12.

Plaintiff's arguments regarding floodplain discussions are particularly troubling when read with the solicitation. RLP § 2.02 explicitly states, "[a] Lease will not be awarded for any offered Property located within a 100-year floodplain unless the Government has determined that there is no practicable alternative." AR at 1933. Welbourn testified he read the RLP and understood this provision. Welbourn Dep. at 23:18–24:4; Tr. at 34:18–22 ("THE COURT: [Welbourn] knew that other people could have bid and other people could have had non-floodplain properties. [PLAINTIFF]: That is correct. He knew other people could bid."). Welbourn also testified he received the "deficiency letter" and discussed all seven items on the 15 January 2021 call. Welbourn Dep. at 26:22–27:9. An understanding of RLP § 2.02, plus the three uses of "deficiency" in the 12 January 2021 email, the 12 January 2021 letter asking to confirm the floodplain status, and the 15 January 2021 phone call should "generally lead" plaintiff to understand its floodplain designation required "amplification or correction[.]" *WorldTravelService*, 49 Fed. Cl. at 439. Plaintiff's understanding of the RLP and the government's communications should have led plaintiff to realize "the clear import of [GSA]'s information requests and questions—that there were several . . . defects in [plaintiff]'s proposal." *CACI Field Servs., Inc.*, 13 Cl. Ct. at 734.

Plaintiff's actions after the 12 January 2021 letter and 15 January 2021 call also indicate "meaningful discussions" occurred. *See id.* at 734–35. Plaintiff's first two submitted proposals indicated the property was located in a 500-year floodplain. AR at 680, 875. Welbourn testified after a second round of discussions, "I went back to look at the initial [12 January 2021] letter to make sure all seven items that were identified *were fixed* going into the final proposal submission[.]" Welbourn Dep. at 25:16–19 (emphasis added); Tr. at 32:8–22 (plaintiff's counsel explaining Welbourn changed the floodplain designation because it was a discussion item listed

in the deficiency letter).  In both its February and March proposals, plaintiff indicated the property was located in a 100-year floodplain.  AR at 1003, 1009.  Changing the floodplain status shows plaintiff was "generally lead [] into the area[] of [plaintiff's] proposal[] requiring amplification or correction" during discussions.  *See WorldTravelService*, 49 Fed. Cl. at 439. The discussions were meaningful because plaintiff was "sufficient[ly] . . . alert[ed] . . . to deficiencies and weaknesses" and was given "the opportunity to revise these areas[,]" which plaintiff did.  *CACI Field Servs., Inc.*, 13 Cl. Ct. at 734–35.

At oral argument, and in its briefing, plaintiff asserted being in a 100-year floodplain is not itself a deficiency.  Tr. at 38:19–21 (plaintiff's counsel stating, "[Welbourn] was working to fill in the correct chart, which floodplain it was in, 500-year or 100-year.  But that's not a deficiency.");  Pl.'s Comb. Reply at 14.  Plaintiff argues there would only be a deficiency if plaintiff's site was "in the *100-year* floodplain *and* another offeror's site was outside of the 100-year floodplain and was otherwise responsive.  Pl.'s Comb. Reply at 14.  The government admits it was aware of Imperium's proposal and floodplain status before the January discussions. Tr. at 50:22–51:3.  As such, plaintiff argues the government was required to keep plaintiff apprised of other bids that were outside of the 100-year floodplain so the government could officially tell plaintiff it was deficient when it received them.  Pl.'s Comb. Reply at 14–15; Tr. at 92:11–14 (plaintiff's counsel arguing the government "determined that the Imperium proposal met their requirements[, so] . . . they should have told us we had a deficiency").  This is contrary to a core element of the FAR which states "Government personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another."  FAR § 15.306(e)(1). Plaintiff cites no caselaw or FAR provision to suggest the government was required to inform plaintiff of another bidder's floodplain status.  As the government explained in oral argument, until the close of final proposals, it would be too soon to tell whether there was an adequate proposal with no floodplain issue because a bidder like defendant-intervenor could have been excluded for other reasons up to the point of final submissions.  Tr. 46:23–48:23; *see also* Shulin Dep. at 28:13–15 ("Like I said, it was too soon to tell.  We were still evaluating offer and things can change.").  Rather, the government fulfilled its meaningful discussions obligation when it drew plaintiff's attention to the discrepancy in its floodplain designation and the submitted FEMA map.  Tr. at 26:8–11 ("THE COURT:  . . . Ms. Shulin testifies that there was communication about the proposal contradicting the floodplain map.  [PLAINTIFF]: That is correct.").  Plaintiff responded to the 15 January 2021 discussions by submitting a bid containing a 100-year floodplain designation.  Tr. at 39:22 (plaintiff's counsel stating the 100-year floodplain designation "is an error on [Welbourn's] part"); Welbourn Dep. at 25:16–21.  Plaintiff submitted this 100-year floodplain designation error twice despite understanding RLP § 2.02 and its awareness other bidders may be outside the 100-year floodplain.  Welbourn Dep. at 23:20–24:4; Tr. at 34:18–22.  Plaintiff maintains the government owed it even more floodplain discussions; however, the government is not obligated to re-discuss items which a bidder has already had an opportunity to respond, or to "'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." *WorldTravelService*, 49 Fed. Cl. at 439–40; *see also* FAR § 15.306(d)(3) ("the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.").

In addition to arguing discussions were not meaningful, plaintiff argues Welbourn was misled by the government, stating, "during Dolphin's January 15, 2021 discussions session, even though Dolphin's proposed site did not reside within the 100-year flood plain, GSA's brokers Meg Shulin and Patrick Burke directed Dolphin to state in its revised proposal that the company's site resided within the 100-year flood plain." Pl.'s MJAR at 27–28 (citing AR at 2842 (Welbourn Decl. ¶ 6)). Plaintiff continues, "Dolphin followed GSA's brokers [sic] directive and stated in its January 26, 2021 revised proposal that the site resided in the 100-year flood plan [sic]." *Id.* at 28 (citing AR at 2842 (Welbourn Decl. ¶ 8), 875). The government, however, argues plaintiff was not misled. Gov't's Reply at 7–8. Regarding the 15 January 2021 phone call, Ms. Shulin testified:

> Q: "Now in your discussion on January 15, 2021, did you tell Mr. Welbourn and Mr. Hutchens that they needed to check—they needed to go back and check the 100-year floodplain and resubmit Form 1364?" A: "*No, I did not.* In that conversation I only flagged the fact that our floodplain check indicated that they were in the 100-year flood zone. . . . You guys might want to go back and double-check and confirm. I only asked them to look into it further." Q: "So you didn't direct them which box to check then you're telling me, is that what you're saying?" A: "*No, I did not direct anybody*."

Gov't's Am. MJAR at 25 (quoting Shulin Dep. at 25:19–26:13). The government also emphasizes, "Mr. Welbourn has no documentation, contemporaneous (in the form of notes, emails, or memorandum to his clients) or otherwise to support this claim." *Id.* at 24. The government continues, "Mr. Welbourn testified that he took notes of the January 15 phone call on a printed version of Dolphin's January 12, 2021 deficiency letter, but 'after we finished the submission, I threw [these notes] away.'" *Id.* (quoting Welbourn Dep. at 27:19–22).

"While an agency has considerable discretion in conducting discussions with offerors, that discretion is not a license to mislead an offeror." *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45 (2016). "Misleading discussions are characterized by communications from the government that are incorrect, confusing or ambiguous[,]" and "must not misdirect the protestor as it revises its proposal." *RMGS, Inc. v. United States*, 140 Fed. Cl. 728, 741 (2018) (cleaned up). Asking Welbourn to check the floodplain status was properly marked because the government's own evaluations might have indicated otherwise, or because plaintiff's proposal was self-contradicting, does not constitute "directing" plaintiff to change its proposal. At oral argument, plaintiff agreed there is no evidence it was directed to change its floodplain status to 100-year besides competing testimony. Tr. at 41:2–16. Following the 15 January 2021 discussions, plaintiff remained free to make any adjustments to its floodplain designation, or none at all. Rather than submit what plaintiff believed was a correct floodplain designation, plaintiff submitted a bid it now believes was "an error[.]" Tr. at 39:22. Plaintiff did so while aware of RLP § 2.02, without coercion, and without protest or any contemporaneous documentation explaining the decision. *See Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 226 (2016) ("There is no evidence this change was the result of coercion on the part of the government; indeed, [plaintiff] was free to make any adjustment to its . . . proposals, or none at all, based on its assessment of the validity of the [government]'s concerns."). It is incumbent upon plaintiff "to submit correct information," Tr. at 85:8–10, in a "well-written

proposal[.]" *Structural Assocs.*, 89 Fed. Cl. at 744.  The Court does not find any evidence of misleading discussions by the government explaining plaintiff's failure to fulfil its obligations here.  Gov't Am. MJAR at 25 (quoting Shulin Dep. at 25:19–26:13); *see also Caddell Constr. Co.*, 125 Fed. Cl. at 45; *RMGS, Inc.*, 140 Fed. Cl. at 741.

In sum, plaintiff fails to show its floodplain discussions with the government were not meaningful.  FAR § 15.306(d)(3).  The government held discussions which were adequate to "generally lead [plaintiff] into the areas of [its] proposal[] requiring amplification or correction[.]"  *WorldTravelService*, 49 Fed. Cl. at 439 (quoting *Advanced Data Concepts, Inc.*, 43 Fed. Cl. at 422).  Plaintiff responded to these discussions by submitting a proposal it now contends incorrectly indicated its property is in a 100-year floodplain.  Plaintiff was free to mark a different floodplain status and provide the supporting documentation but did not, despite the warning of exclusion in RLP § 2.02.  The government was not obligated to continue discussing plaintiff's floodplain status with it, FAR § 15.306(d)(3), and was not obligated to warn plaintiff of other bidders' floodplain status, FAR § 15.306(e)(1).  "While the [C]ourt agrees with [plaintiff] that more could have been done to communicate the [g]overnment's concerns, the level of discussions was, given the legal threshold, adequate."  *CACI Field Servs., Inc.*, 13 Cl. Ct. at 732, *aff'd*, 854 F.2d 464 (Fed. Cir. 1988); *WorldTravelService*, 49 Fed. Cl. at 439 (quoting *Advanced Data Concepts, Inc.*, 43 Fed. Cl. at 422); *see also Innovative Test Asset Sols. LLC*, 125 Fed. Cl. at 226.

## 2.    Additional Remarks and/or Conditions

Plaintiff also argues GSA failed to conduct meaningful discussions regarding plaintiff's additional remarks addendum.  Pl.'s MJAR at 28.  In its final proposal, plaintiff included an "additional remarks and/or conditions" addendum stating, "[t]his Offer is conditioned upon the following items and any lease amendment in response to the RLP shall reflect and incorporate these remarks or conditions."  AR at 1010–13.  "[O]n January 21, 2022, *for the first time in this procurement*, and two months after Dolphin provided GSA (for the fourth time) with a wealth of material demonstrating that Dolphin's proposal complied with RLP flood plain requirements and was not deficient[,]" according to plaintiff, "GSA informed Dolphin that its 'Additional Remarks And/Or Conditions' rendered Dolphin's offer deficient, technically unacceptable and ineligible for award."  Pl.'s MJAR at 30 (citing AR at 2375[7]).  Plaintiff asserts "GSA has possessed a copy of Dolphin's 'Additional Remarks And/Or Conditions' since December 15, 2020," but "[f]or over a year, GSA never mentioned Dolphin's Conditions as presenting an impediment to award."  *Id.*  Similar to its argument regarding the floodplain issue, plaintiff argues the 12 January 2021 "Deficiency Letter" does not constitute a meaningful discussion because it "states only that the parties are '[t]o discuss on call,' the 'GSA Form 1364 Additional Remarks,' and does not identify" this as a deficiency.  Pl.'s Comb. Reply at 20 (citing AR at 1644).  Regarding Welbourn's testimony about the "Deficiency Letter," plaintiff notes the relevant deposition exchange "hardly reflects Mr. Welbourn's conception of the letter and is simply an example of him parroting the terminology used by the Government."  *Id.* at 21 (citing Welbourn Dep. at 26:22–27:2).  Finally, plaintiff argues "the RLP does not state that GSA offerors will

---

[7] Plaintiff does not explain how the second page of the Price Negotiation Memorandum and Record of Award Decision, which does not mention any dates beyond 2020, supports its proposition.

automatically be deemed deficient, technically unacceptable or otherwise ineligible for award if their 'Additional Remarks' propose modifications to the RLP terms. Rather, the RLP simply gives GSA the discretion to refuse to accept modifications proposed by offerors." *Id.* at 23. "By definition," plaintiff argues, "this means that while the Government is free to reject proposed modifications to the RLP terms, it is also free to consider and even accept some or all of an offeror's modifications[.]" *Id.*

The government argues, similar to the discussions for the floodplain requirement, "GSA's first deficiency letter . . . advised Dolphin that these additional terms and conditions were an issue for parties to discuss on January 15, 2021." Gov't's Am. MJAR at 35 (citing AR at 1644; Shulin Dep. at 15:12–14). The government notes, "Mr. Welbourn confirmed that the additional conditions and remarks . . . were discussed." Gov't's Reply at 11 (citing Welbourn Dep. at 26:22–27:9). Further, GSA broker Kazi Rizvi testified: "I informed [plaintiff's brokers] that offerors have the right to request deviations from RLP/Lease requirements but that any deviation may make their offer technically unacceptable compared to other offers with no deviations. AR at 2852 (Rizvi Declaration). The government also points to RLP § 4.03(C) which states "[i]f an offer contains terms taking exception to or modifying any Lease provision, *the Government will not be under any obligation to award a Lease in response to that offer*." Gov't's Am. MJAR at 35 (quoting AR at 1942) (internal quotations omitted). "There is no requirement," according to the government, that it "negotiate with offerors or make any decision with respect to the deviations prior to the receipt of final proposal revisions." Gov't's Reply at 10. The government also highlights the language of RLP § 3.06(X) which provides "if the Offeror requests any deviations, GSA at its sole discretion will make the decision whether to accept the deviation[,]" noting the terminology "does not impart any obligation on the part of the Government to discuss its consideration on any requests for deviation." *Id.* (citing AR at 504). The government concludes the inclusion of deviations plus plaintiff's "failure to mark Box 33 on its Form 1346 shows that it understood that it was not assenting to the terms of the RLP." Gov't's Am. MJAR at 35 (citations omitted). Imperium concurs with the government's arguments. *See* Def.-Int.'s Reply, at 1, 4–5; Def.-Int.'s Am. MJAR at 15–17.

As discussed *supra* Section V.B.1, discussions are deemed meaningful when "they generally lead offerors into the areas of their proposals requiring amplification or correction[.]" *WorldTravelService*, 49 Fed. Cl. at 439 (quoting *Advanced Data Concepts, Inc.*, 43 Fed. Cl. at 422).

The 12 January 2021 email from Shulin to Welbourn states, "please see our request and *deficiency letter* attached. I've blocked off some time . . . to discuss these *deficiencies*" with an attachment labeled "6FL0544 *Deficiency Letter* Dolphin Corporate Center." AR at 2664 (emphasis added). The 12 January 2021 "Deficiency Letter" identified "GSA Form 1364 Additional Remarks" as an item "[t]o discuss on [the] call" that was scheduled "to discuss these *deficiencies*." AR at 1644, 2664 (emphasis added). On Form 1364, Item 31, plaintiff noted, "[s]ee additional remarks or conditions included as part of this offer" and attached "additional remarks and/or conditions" containing twenty terms and stating "[t]his Offer is conditioned upon the following items and any lease awarded in response to the RLP shall reflect and incorporate these remarks or conditions." AR at 679, 681–84. Plaintiff's proposal also failed to mark compliance with item 33 on Form 1364 which stated the following:

>33.   BY SUBMITTING THIS OFFER, THE OFFEROR AGREES UPON
>ACCEPTANCE OF THIS PROPOSAL BY HEREIN SPECIFED DATE, TO
>LEASE TO THE UNITED STATES OF AMERICA, THIS PREMISES
>DESCRIBED, UPON THE TERMS AND CONDITIONS AS SPECIFIED
>HEREIN, *IN FULL COMPLIANCE WITH AND ACCEPTANCE OF THE
>AFOREMENTIONED RLP, WITH ATTACHMENTS.*
>
>☐  I have read the RLP with attachments in its entirety and am requesting no
>deviations.

AR at 679 (emphasis added); *see also* Tr. at 58:6–20 ("THE COURT: . . . [Y]our offer was expressly conditional upon the agency accepting the additional terms? [PLAINTIFF]: That is correct. THE COURT: Okay. [And p]laintiff's proposal did not mark compliance with item number 33 on Form 1364, correct? . . . [PLAINTIFF]: Yeah, we requested deviations and they were—they were noted on the letter of January 12, and *there was a discussion about those*, but we were never told that those constituted a deficiency or a material weakness." (emphasis added)).  RLP § 4.03(C) provides, "[i]f an offer contains terms taking exception to or modifying any Lease provision, *the Government will not be under any obligation to award a Lease in response to that offer*."  AR at 1942 (emphasis added).  RLP § 3.06(X) states "[i]f the Offeror requests any deviations, . . . GSA *at its sole discretion* will make the decision whether or not to accept the deviation."  AR at 1941 (emphasis added).

For the same reasons stated *supra* Section V.B.1, an understanding of these RLP provisions, the several instances describing the additional remarks as a "deficiency" in the 12 January 2021 email, the 12 January 2021 letter stating the additional remarks were to be discussed on the phone call, and the phone call itself discussing the remarks are sufficient to "generally lead" plaintiff to understand the additional remarks required "amplification[.]"  *WorldTravelService*, 49 Fed. Cl. at 439.  Plaintiff received these communications from the government following its initial proposal and decided to keep the additional remarks in its three subsequent revised proposals.  AR at 874, 1002, 1008.  Plaintiff was free to drop its deviations and submit a compliant proposal but instead accepted the risk and submitted an intentionally noncompliant proposal with the additional remarks.  AR at 1941–42.  The Court finds the government held discussions which were adequate to "generally lead [plaintiff] into the areas of [its] proposal[] requiring amplification or correction[.]"  *WorldTravelService*, 49 Fed. Cl. at 439 (quoting *Advanced Data Concepts, Inc.*, 43 Fed. Cl. at 422).

Although the Court finds discussions were sufficient, it is not clear the CO was required to conduct any discussions at all pertaining to the additional remarks.  FAR § 15.306(d)(3) states, "the contracting officer is not required to discuss every area where [a] proposal could be improved[, and t]he scope and extent of discussions are a matter of contracting officer judgment."  Every one of plaintiff's proposals noted it was not in compliance with the terms of the RLP and was expressly conditioned on the acceptance of deviations.  AR at 679, 681–84.  Plaintiff submitted these proposals in the face of understood RLP provisions that warned the government has no obligation to accept to a noncompliant proposal.  AR at 1941–42.  These RLP provisions, however, allow the government discretion to accept plaintiff's noncompliant proposal.  *Id.*  As such, the additional remarks do not render plaintiff's proposal per se

technically unacceptable.  *Id.*  Although Shulin's 12 January 2021 email identifies them as "deficiencies," under FAR § 15.306(d)(3), they may ultimately be only an "area where the proposal could be improved."  If so, FAR § 15.306(d)(3) grants the government the discretion to forego discussing the additional remarks when RLP §§ 3.06(X), 4.03(C) grant the government discretion to accept the additional remarks.  In either case, the government fulfilled its discussions obligations.  *WorldTravelService*, 49 Fed. Cl. at 439.

### 3.   Whether Further Discussions Were Required During Corrective Action

Plaintiff argues the government should have held another round of discussions during the September 2021 corrective action.  Pl.'s Comb. Reply at 30.  Plaintiff notes, "[d]uring the entire three-month period of corrective action ending on January 17, 2022, GSA never had any discussions with Dolphin about these additional conditions in Dolphin's proposal."  Pl.'s MJAR at 31 n.22.  Plaintiff argues, "[e]ven though GSA possessed the discretion to re-open discussions, examine the [new floodplain] material and make a new award decision, it refused to do so . . . ."  Pl.'s Comb. Reply at 30.  Plaintiff emphasizes, "GSA never provided a rationale for its refusal to re-open discussions and consider the evidence provided by Dolphin, other than the fact that the deadline for submission of final proposals had passed[.]"  *Id.* at 31 (emphasis removed).  Plaintiff agreed at oral argument the government could not consider any of plaintiff's submissions that followed the 18 March 2021 deadline for final revised proposals without reopening discussions.  Tr. at 115:10–12 (plaintiff's counsel stating, "I agree he would have had to reopen discussions to take those submissions").[8]

FAR § 15.306(d)(3) obligates the government to hold discussions regarding deficiencies and significant weaknesses "to which the offeror has not yet had an opportunity to respond."  "Under section 15.306(d)(3), whether discussions should be conducted lies within the discretion of the contracting officer. . . .  [A]bsent bad faith or an abuse of discretion, the contracting officer need not conduct discussions."  *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (citations omitted); Tr. at 114:24–115:5 (plaintiff's counsel agreeing discussions are discretionary subject to an abuse of discretion standard of review).

As discussed *supra* Sections V.B.1–2, the government held meaningful discussions with plaintiff regarding its floodplain status and additional remarks on 15 January 2021.  During corrective action, the government determined "reopening discussions and inviting a fifth round of proposal revisions for the corrective action was not necessary."  Gov't's Am. MJAR at 15 (citing AR at 2374 (CO memo reaffirming award to defendant-intervenor)).  Although the government did not explain why reopening discussions was unnecessary, plaintiff has not

---

[8] On 6 May 2022, the Court ordered the government to supplement the AR with plaintiff's GAO protest record "for the limited purpose of deciding whether [plaintiff] timely submitted [GAO] Protest Exhibits I and L, and whether GSA should have considered them, and, if so, following any briefing considering the Court's ruling in that regard, whether their consideration undermines the agency's award decision."  6 May Order at 12 (quoting JSR at 2, ECF No. 67) (internal quotations omitted); *see also id.* at 15 (rejecting the November letter and elevation certificate from the AR and narrowing review to whether the government should have considered them).  As plaintiff now concedes the government could not consider any of plaintiff's late submissions without reopening discussions, that narrows the issue to only whether the government should have reopened discussions.  *See* Tr. at 115:10–12 (plaintiff's counsel stating, "I agree he would have had to reopen discussions to take those submissions").

identified any case supporting its assertion the agency was required to provide a rationale for not reopening discussions during corrective action. Pl.'s Comb. Reply at 31; Tr. at 115:24–116:4 (plaintiff's counsel stating, "I have no case for that, Your Honor."). As the government has already afforded plaintiff its "opportunity to respond" regarding its floodplain status and additional remarks, FAR § 15.306(d)(3) does not obligate the government to discuss these issues with plaintiff again. Following discussions on plaintiff's floodplain designation, plaintiff submitted a final proposal that indicated its property is in a 100-year floodplain and included a FEMA map in support. AR at 1009, 1053. Following discussions on plaintiff's additional remarks, plaintiff submitted a final proposal that affirmatively did not comply with the RLP and was contingent on the government accepting deviations. AR at 1008. It was not an abuse of discretion for the government to decline to doubly fulfill its FAR discussions obligations. FAR § 15.306(d)(3) (obligating the government to hold discussions regarding deficiencies and significant weaknesses only to "which the offeror has not yet had an opportunity to respond"). Plaintiff's desire to amend its proposal months after final submissions were due does not alter this conclusion. Tr. at 53:7–57:17 (plaintiff's counsel confirming its original proposal was incorrect and plaintiff's revised proposals contained further errors it did not seek to correct until 17 May 2021) . Therefore, the Court concludes the government did not abuse its discretion in declining to reopen discussions. *See JWK Int'l Corp.*, 279 F.3d at 988.

### C.    Whether GSA Disparately Treated Plaintiff

Plaintiff argues the government treated its proposal in a disparate manner, thereby prejudicing the outcome against plaintiff. Pl.'s MJAR at 31; *see supra* note 6. Plaintiff first argues the government should have eliminated defendant-intervenor for proposing office space comprising the first and top floors of a building. Pl.'s MJAR at 32. Second, plaintiff argues the government disparately treated plaintiff by not accepting its late 17 May 2021 floodplain document submissions after accepting defendant-intervenor's late 17 February 2021 fire safety document submissions. *Id.* at 34 n.26.

### 1.    First and Top Floor Office Space

Plaintiff first notes, "[t]he RLP expressly prohibited offerors proposing newly constructed office space from offering space on the first or the top floors of their newly constructed building." *Id.* at 32; *see* AR at 1992 (two criteria which eliminate space from consideration are:  (1) "[p]roposed office space is on the first floor or below the first floor of the building"; and (2) "[p]roposed office space is on the top floor of the building and rooftop access is within the space."). Imperium's building, according to plaintiff, is "only a two-story building, and therefore, by definition, Imperium's proposed space is located on the first *and* the top floor of the building in violation of the express written language of RLP Exhibit B." Pl.'s MJAR at 32 (citing AR at 1402). Plaintiff infers, "[r]ather than disqualify Imperium from award as required, GSA simply waived these RLP requirements—even though ATFE imposes these requirements for security purposes." *Id.* Despite Imperium claiming these limitations on "new office spaces" do not apply to Imperium because its proposed space is not a "new construction," plaintiff argues, "Imperium confuses the phrase 'new office space' to mean newly constructed office space[,]" and "it is clear that these requirements apply to all new office spaces being proposed." Pl.'s Comb. Reply at 43. Plaintiff instead asserts, "the only space to which these RLP

requirements do not apply to is the incumbent property, in this case, the property being proposed by Dolphin." *Id.*

The government responds, stating, "nowhere in I[mperium]'s proposal does it state that I[mperium] is proposing the use of the first floor of its two-story building[,]" and "[s]uch an argument would naturally render all buildings ineligible because logically all buildings contain a first floor and thus would be technically unacceptable." Gov't Am. MJAR at 40. According to the government, Exhibit B's "Tenant Office Space Requirements" are "ATF's general requirements developed at a national level that guide all of its leases but are not tailored to each specific procurement." Gov't's Reply at 17. "These requirements," the government continues, "must be read in conjunction with RLP Section 1.04(E) 'Unique Requirements', which provides the specific ATF requirements most applicable to this procurement." *Id.* RLP § 1.04(E) provides each "[o]ffered space will be evaluated by agency security team[,]" AR at 1928, and, therefore, the government argues, "[t]his provision is designed to allow GSA and ATF to evaluate on a case-by-case basis whether each offered building meets the security requirements." Gov't's Reply at 17. The government additionally points to the 25 June 2020 revised RLP which "provided a modification of the unique requirements for the building to allow for consideration of buildings that would utilize the top floor." Gov't Am. MJAR at 40 (citing AR at 435 ("top floor space will be considered on a case-by-case basis.")). The government argues "GSA's seven public advertisements advised that GSA and ATF were required to relax the security requirements encompassed in Exhibit B . . . . ATF conducted individual evaluations consistent with Section 1.04(E) of each building and signed off on those that met the security requirements." Gov't's Reply at 17–18 (citing AR at 1873, 1920). Even if GSA waived a security requirement for Imperium, the government argues, "it did so equally for Dolphin" because "Dolphin also offered the full space on the top floor of its building and was similarly not eliminated as technically unacceptable." *Id.* at 18 (citing AR at 1007). The government additionally notes, "Section B states that commercial space will be eliminated if it houses 'colleges and/or universities[,]'" and "Dolphin's proposed building, at the time of the procurement, housed Cesar Vallejo College." *Id.* (citing AR at 688, 764, 769). The government concludes "to the extent GSA waived security requirements for Imperium, it did so for Dolphin too." *Id.*

Imperium argues Dolphin's interpretation is incorrect because "Dolphin ignores the fact that this requirement ONLY applies to new office space, which Imperium's building is NOT. Imperium's building is existing space being renovated for single use occupancy by the ATF." Def.-Int.'s Am. MJAR at 18. Imperium rejects plaintiff's understanding of the phrase "new office space" to exclude only incumbent space rather than any space not "new construction," arguing, "this interpretation runs contrary to the plain language of the meaning 'new', which is defined as 'having recently come into existence[.]'" Def.-Int.'s Reply at 10 (citation omitted). Imperium argues plaintiff's interpretation "would mean that [the requirements] preclude the consideration of stand-alone, single-use occupancy buildings because such buildings necessarily have both a first floor and a top floor. This interpretation . . . contravenes the Solicitation terms which in no way restrict an award under the RLP to single-tenant buildings." *Id.* Imperium concludes, "the building configuration requirements relied on by Dolphin to allege disparate treatment do not apply to Imperium's building." Def.-Int.'s Am. MJAR at 18–19.

"[A] contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 749 (2021) (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)) (internal quotations omitted). To prevail on a disparate treatment claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citation omitted). "A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Id.* (citing *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012)).

Plaintiff contends the government should have excluded defendant-intervenor under Exhibit B to the RLP: "Criteria That Eliminates Commercial Space From Consideration for *New Office Space*[.]" AR at 1992 (emphasis added); Pl.'s MJAR at 32. Specifically, plaintiff alleges defendant-intervenor is ineligible for award for proposing office space that "is on the first floor" and "the top floor of the building[,]" as Exhibit B prohibits such space. Pl.'s MJAR at 32 (quoting AR at 1992) (internal quotations omitted). At oral argument, the government agreed RLP § 1.06 generally incorporates the ATF requirements in Exhibit B but argued the final RLP § 1.04 supersedes any general requirements of Exhibit B, including the floor requirement. Tr. at 117:17–23, 120:1–121:10. RLP § 1.04(E), "Unique Requirements," states, "[o]ffered space will be evaluated by agency security team. If offered building is a single tenant facility, perimeter fencing must be installed." AR at 1928. If the "Unique Requirements" supersede Exhibit B as the government argues, there was no mandatory floor requirement and neither party was treated disparately. *See CW Gov't Travel, Inc.*, 154 Fed. Cl. at 749.

Plaintiff argues RLP § 1.04(E) does not supersede Exhibit B and its floor requirements. Tr. at 128:7–24. Plaintiff contends, although it also offered top floor space, it is not "new" because it is the incumbent contractor, so the floor requirement does not apply to it. Pl.'s Comb. Reply at 43; Tr. at 132:20–133:23 (plaintiff's counsel agreeing if Exhibit B applies to its proposal, "then both proposals should have been excluded"). Plaintiff cites no authority to support its theory that incumbent properties are not required to comply with the floor requirement. Pl.'s Comb. Reply at 43. Plaintiff's brief explains the floor requirement was "imposed for security purposes," but does not explain how an incumbent property utilizing top floor space satisfies those "security purposes" in a way other bidders cannot. *Id.* (citing AR at 1992). Neither the RLP nor the GSA Leasing Desk Guide support plaintiff's incumbent argument. Tr. at 123:24–128:5 (government counsel explaining Exhibit B does not apply to any bidder, but if it does apply, it applies to every bidder because every lease under the RLP is a "new" lease, so the government waived the floor requirement equally for both plaintiff and defendant-intervenor). At oral argument, the government explained the GSA Leasing Desk Guide precludes plaintiff's argument. Tr. at 127:13–19 (government counsel explaining "every lease is a new lease[, and Exhibit] B would have applied to every single offeror, including the incumbent."). The Leasing Desk Guide, according to the government, dictates every lease under this RLP is considered "new," and therefore even plaintiff is considered a "new" office space. *Id.*; *see* Gen. Servs. Admin., *Leasing Desk Guide* 2-ii (2022), https://www.gsa.gov/ cdnstatic/General/From_Word_to_PDF_C_-_LDG_Chapter_2_New_or_Replacing_Lease_8_29

_22_%5B162_Alt_Text__212_Image_Errors%5D.pdf. ("New or replacing leases are defined as leases with new terms and conditions and new lease contract numbers, applicable for either a new requirement or to replace an existing expiring lease.").[9]  If all bids were subject to the Exhibit B floor requirement under the Leasing Desk Guide, both plaintiff and defendant-intervenor should have been excluded because both were offering top floor space.  Tr. at 132:20–133:23 (plaintiff's counsel agreeing if Exhibit B applies to its proposal, "then both proposals should have been excluded").  As plaintiff cites no authority to contradict the Leasing Desk Guide, and nothing in the RLP suggests incumbent properties are exempt from any requirements, the Court finds plaintiff's argument unpersuasive.  If the Exhibit B floor requirements applied to this RLP, then the government waived the requirement for both plaintiff and defendant-intervenor and thus did not treat plaintiff disparately.  *See CW Gov't Travel, Inc.*, 154 Fed. Cl. at 749.

### 2. Late Fire Safety Information

Plaintiff also claims disparate treatment, alleging "GSA not only accepted, but *requested*, additional information from Imperium after the deadline for submission of FPRs" when GSA requested Imperium "complete its offer and submit this missing fire safety information."  Pl.'s MJAR at 35 n.26 (citing AR at 2703–04).  Plaintiff notes GSA's request was made to Imperium on 17 February 2021, "[e]ight days after the deadline for FPR submittal[.]"  *Id.* (citing AR at 2703).  The fire safety information, according to plaintiff, "was a mandatory requirement of the RLP[,]" and, "[a]ccording to Meg Shulin, failure to submit a document is considered a deficiency."  Pl.'s Comb. Reply at 44 (citing AR 1939; then citing Shulin Dep. at 20:15–16).  Plaintiff disagrees with the government's contention no disparate treatment exists "because another proposal revision was allowed to be submitted after Meg Shulin requested information from Imperium," arguing "[w]hen Meg Shulin requested that Imperium complete its offer and submit this missing fire safety information, Ms. Shulin *was not aware that there was going to be another round of proposal submissions*" and the fire safety information submission occurred past "what was, at that time, the final FPR submittal deadline[.]"  *Id.*  Plaintiff concludes, "GSA refused to treat Dolphin in this same manner and instead twice refused to consider the floodplain information Dolphin submitted—even though GSA *knew* that Dolphin disputed GSA's assertion that Dolphin's site and access thereto resided within the 100-year floodplain."  Pl.'s MJAR at 35 n.26.

The government emphasizes the difference between plaintiff's submissions and Imperium's submissions, stating, "GSA accepted fire and life safety material from I[mperium] on February 17, 2021 but did not accept additional materials from Dolphin on May 17, 2021[,]" and noting "[f]inal proposal revisions were due on March 18, 2021 . . . well *after* Ms. Shulin requested certain materials from I[mperium.]"  Gov't's Am. MJAR at 40 n.11 (citations omitted).  Plaintiff's submissions, the government argues, "were well after the close of final proposal revisions on March 18, 2021."  *Id.*  The government clarifies plaintiff's "argument is

---

[9] Gen. Servs. Admin., *Leasing Desk Guide* 1 (2011), https://www.gsa.gov/cdnstatic/LDG-CHAPTER_INTRODUCTION-FINAL_9-30-11final_508C.pdf ("Applicability[.]  The provisions of this Desk Guide apply to all [Public Buildings Service] personnel engaged in the acquisition and administration of lease contracts.  This Desk Guide also applies to agencies leasing space under delegated authority from the General Services Administration (GSA).").

not persuasive because Dolphin is addressing two separate proposal submissions.  On March 11, 2021, GSA allowed *all* offerors to revise and resubmit their entire proposals with no limitations." Gov't's Reply at 18–19.  "By comparison," the government argues, "GSA did not evaluate any additional untimely materials submitted after final revised proposal submissions after March 18, 2021."  *Id.* at 19.  The government concludes, "GSA allowed Dolphin and Imperium a final, equal opportunity to revise their proposals in March."  *Id.*

Imperium disagrees with plaintiff's argument, noting, "not once did Ms. Shulin testify . . . she did not know that there would not be another round of proposal revisions when she made the request for documents to Imperium."  Def.-Int.'s Reply at 10–11.  Imperium argues, "irrespective of whether Ms. Shulin knew if there would be another round of proposal revisions, the fact remains that Imperium submitted the required documents with its revised FPR on or before March 18, 2021."  *Id.* at 11.

As described *supra* Section V.C.1, to prevail on a disparate treatment claim, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372 (citation omitted).  "A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines."  *Id.* (citing *Sci. Applications Int'l Corp.*, 108 Fed. Cl. at 272).

The RLP includes certain "Fire Protection and Life Safety" provisions, requiring offerors to either:

> A.      Verify in the Lease proposal that the Building in which Space is offered meets the Means of Egress, Automatic Fire Sprinkler System, and Fire Alarm System requirements of the Lease; or
> B.      Include as a specific obligation in its Lease proposal that improvements to bring the Building into compliance with Lease requirements will be completed prior to acceptance of the Space.

AR at 1934 (RLP § 2.08).  On 17 February 2021, after the close of the 9 February 2021 deadline for submissions, GSA's Megan Shulin sent defendant-intervenor the following:

> We need more documentation in order to have our fire protection and life safety expert review this building.  Please see below.  I've attached a new form that apparently needs to be filled out these days as well.  In your revised offer you only provided photos of the inspection tags and not actual reports but that was not sufficient for his review, I guess.

AR at 2703 (Fire Safety Email from Shulin).  Defendant-intervenor sent Shulin the required documentation on 17 February, 18 February, and 19 February 2021.  *See* AR at 2703–05 (Fire Safety Email Communication).

Defendant-intervenor's submissions were "late" as they relate to the 9 February deadline for revised proposal submissions, yet these submissions substantively differ from plaintiff's untimely submissions. Imperium's emailed submissions were *consistent* with its prior submission including "photos of the inspection tags" attached as evidence of compliance with the fire and safety requirements. *See* AR at 2703 (Fire Safety Email from Shulin). Plaintiff's late submissions, on the other hand, were *inconsistent* with its prior submissions which indicated the property lay within a different floodplain. AR at 1009. Plaintiff's 17 May 2021 submissions related to its floodplain status, not fire safety documentation, and were meant to *contradict* its prior classification as a 100-year floodplain. AR at 2674–78 (Welbourn 17 May 2021 emails to Shulin). Plaintiff's late submissions further came two months after the 18 March 2021 final deadline for revised proposals, whereas defendant-intervenor's late submissions came a full month before that final deadline. *See* AR at 2703–05, 2674–78. The government also explained at oral argument the floodplain requirement is "considerably more important" than the fire safety requirement because the office must continue operating in the event of a flood. Tr. at 139:17–141:5.

To show disparate treatment, plaintiff "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372 (citation omitted). The late submissions from defendant-intervenor and plaintiff are different in kind—defendant-intervenor's additional submission sought to *support* its prior submission while plaintiff's late submission sought to *contradict* its prior submissions. Moreover, the two parties' submissions sought to address different RLP requirements—defendant-intervenor addressing its fire safety systems under RLP § 2.08, and plaintiff addressing its floodplain status under RLP § 2.02. Most importantly, the parties' late submissions are late with respect to different proposal revision deadlines—defendant-intervenor's submissions came eight days after the 9 February 2021 revision deadline, and plaintiff's submissions came two months after the final 18 March 2021 revision deadline. *See* AR at 2703–05, 2674–78. The government explained at oral argument it allowed for the fourth round of proposal revisions on 18 March 2021 in order to cure the late submission it accepted from defendant-intervenor. Tr. at 137:2–13 (government counsel explaining the government allowed another round of revised proposals on 18 March 2021 "to level the playing field" and "for all offerors to submit additional documents" after accepting defendant-intervenor's late fire safety submissions). As such, all offerors, including plaintiff, were afforded an opportunity to supplement or amend their proposals after the 9 February 2021 revision deadline, but no bidder was allowed the opportunity to do so after the 18 March 2021 deadline. These two deficiencies, therefore, are not "substantively indistinguishable" or "nearly identical" to each other as plaintiff alleges, and the government did not treat plaintiff disparately. *See Off. Design Grp.*, 951 F.3d at 1372.

D.      **Whether GSA Errors Prejudiced Plaintiff**

Plaintiff claims it was prejudiced by the government's actions because "[h]ad GSA informed Dolphin that it had rendered its offer technically unacceptable and ineligible for award . . . Dolphin would have immediately corrected this erroneous information, demonstrated that it complied with the RLP floodplain requirements, and withdrawn any offending conditions." Pl.'s MJAR at 39. Plaintiff argues it "demonstrated this by providing GSA with

overwhelming evidence of Dolphin's compliance with RLP § 2.02" by submitting "two May 17, 2021 emails, Dolphin's GAO protest, its original and amended Complaints in this Court, and . . . the November 22, 2021 CBRE letter." *Id.* at 39–40.

"Relief in a bid protest may be available to protestor only if it demonstrates that it was prejudiced by the error." *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 193 (2015). "To establish 'significant prejudice' [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the [agency] errors" in the process. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted).

As discussed *supra* Sections V.A–C, the government did not err in awarding the lease to defendant-intervenor. Everything before the agency at the time of its decision, including plaintiff's own proposal, indicated plaintiff's property is in a 100-year floodplain. Even the LOMR plaintiff argues the government should have located in evaluating plaintiff's proposal does not remove plaintiff's ingress, egress, or parking lot from the 100-year floodplain as plaintiff contends. Plaintiff relies on documents outside of the administrative record that it did not submit with its proposals to argue its property is not in a 100-year floodplain.[10] Moreover, the government fulfilled its obligations to have meaningful discussions with plaintiff regarding its floodplain status and additional remarks addendum. The government did not abuse its discretion when it chose not to reopen discussions for a fifth time during corrective action. Lastly, the government did not disparately treat plaintiff—if the first and top floor requirements applied to this RLP, then, as admitted by plaintiff, those requirements were waived equally for both plaintiff and defendant-intervenor. The government declining to accept plaintiff's floodplain document submissions also did not constitute disparate treatment as the government did not accept late submissions from any bidder after 18 March 2021. In conclusion, plaintiff fails to show the government's "action[s] w[ere] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Glenn Def. Marine*, 720 F.3d at 907 (citations omitted); *see also Sys. Application & Techs.*, 100 Fed. Cl. at 711. Plaintiff therefore faced no prejudice and fails to carry its "heavy burden of showing that the award decision had no rational basis." *Allied Tech.*, 649 F.3d at 1326.

## VI.    Defendant-Intervenor's Motion to Dismiss for Lack of Standing

Defendant-intervenor argues plaintiff lacks standing because even if plaintiff proved the alleged errors, plaintiff cannot show "it had a substantial chance of receiving an award." Def.-Int.'s Am. MJAR at 10. Defendant-intervenor alleges plaintiff was technically unacceptable for proposing a property in a 100-year floodplain and "cannot point to even [one] document on the administrative record to show that its property resides outside of a 100-year floodplain." Def.-Int.'s Reply at 12 (emphasis removed). Defendant-intervenor further argues plaintiff's proposal had other deficiencies due to its twenty deviations from the RLP. *Id.*

---

[10] It is further questionable whether the government could have reviewed some of plaintiff's documents, like the Rogers Gray report, in assessing plaintiff's floodplain status even if plaintiff did submit them. The GSA Floodplain Management Desk Guide states, "[t]o determine if the proposed Action is located in a floodplain, the data sources that may be used include:" FEMA flood insurance studies, flood insurance rate maps, and other data; GSA's Multi-Asset Planning Tool; and Google Earth's FEMA National Flood Hazard Layer. AR at 2625–26 (Floodplain Management Desk Guide). None of these categories includes private expert reports.

"The pivotal element of standing in a bid protest is whether a protester qualifies as an 'interested party' under § 1491(b)(1)." *RhinoCorps Co. v. United States*, 87 Fed. Cl. 481, 485 (2009).  To be an "interested party," a protester must show that:  (1) it was an actual or prospective bidder or offeror; and (2) it had a direct economic interest affected by the award of the contract.  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)).  "[P]rejudice (or injury) is a necessary element of standing."  *Myers*, 275 F.3d at 1370.  The Court "looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief."  *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530 (2010).  Plaintiff establishes prejudice for purposes of standing when it shows it "could compete for the contract . . . ."  *Id.* at 531 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)) (internal quotations omitted); *see also RhinoCorps Co.*, 87 Fed. Cl. at 491 n.4 (collecting cases).

Plaintiff is the incumbent lessor and bid on the RLP to keep the ATF in its property.  Am. Compl. ¶ 3; AR at 678 (plaintiff's initial proposal).  Plaintiff's bid included additional remarks and deviations from the RLP the government was not obligated to accept.  *See supra* Section V.B.2.  Plaintiff's bid indicated its property is in a 100-year floodplain, and under RLP § 2.02 plaintiff's property would be excluded from award if there was a practicable alternative.  *See supra* Section V.A–B.1.  Although defendant-intervenor proposed such a practicable alternative, plaintiff's protest presents grounds that, if correct, could have enabled plaintiff to "compete for the contract . . . ."  *Magnum Opus Techs., Inc.*, 94 Fed. Cl. at 531.  First, if the government did not conduct meaningful discussions as plaintiff alleges, that may have warranted reopening discussions and allowing plaintiff to revise and supplement its proposal with respect to its floodplain status.  Second, if the government disparately treated plaintiff as it alleges, that may have meant the government should have excluded defendant-intervenor from award—knocking out the practicable alternative to plaintiff's property.  *See supra* Section V.C.  Lastly, although the government had the discretion to reject all of plaintiff's additional remarks, the government also had the discretion to accept the deviations.  AR at 1941–42 (RLP §§ 3.06(X), 4.03(C)).  As such, the conditions plaintiff alleges do not mean plaintiff could not "compete for the contract . . . ."  *Magnum Opus Techs., Inc.*, 94 Fed. Cl. at 531.

Although plaintiff's bid protest fails on the merits, that does not mean plaintiff lacked standing to bring this case.  Plaintiff, as the incumbent, submitted a bid with weaknesses which ultimately prevented it from receiving the award but not which per se excluded it from the competition.  Plaintiff therefore qualified as an actual prospective bidder with a direct economic interest in the lease award.  *Rex Serv. Corp. v. United States*, 448 F.3d at 1307 (citing *Myers*, 275 F.3d at 1369).  Plaintiff has shown it could "compete for the contract . . . [,]" *Magnum Opus Techs., Inc.*, 94 Fed. Cl. at 531, and therefore qualifies as an "interested party" having standing under 28 U.S.C. § 1491(b)(1).  *RhinoCorps Co.*, 87 Fed. Cl. at 485.  The Court accordingly denies defendant-intervenor's motion to dismiss.

## VII.   Plaintiff's Motion for a Permanent Injunction

Plaintiff seeks a permanent injunction. *See* Pl.'s MJAR at 2. The Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. *Id.* The Court therefore does not consider the remaining factors and denies plaintiff's motion. *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## VIII.   Conclusion

For the reasons discussed *supra*, the Court: (1) **DENIES** plaintiff's motion for judgment on the administrative record, ECF No. 54; (2) **DENIES** plaintiff's motion for a permanent injunction, ECF No. 54; (3) **GRANTS** the government's amended cross-motion for judgment on the administrative record, ECF No. 93; (4) **GRANTS** defendant-intervenor's amended cross-motion for judgment on the administrative record, ECF No. 92; (5) **DENIES** defendant-intervenor's amended motion to dismiss, ECF No. 92; (6) **DENIES as MOOT** the government's motion to prohibit plaintiff's use of demonstrative exhibits, ECF No. 102, *see supra* note 5; (7) **DENIES as MOOT** the government's original cross-motion for judgment on the administrative record, ECF No. 63, *see supra* note 4; and (8) **DENIES as MOOT** defendant-intervenor's original cross-motion for judgment on the administrative record and motion to dismiss, ECF No. 64, *see supra* note 4. The Clerk is directed to enter judgment accordingly.

In accordance with the Court's 6 May Order, the government **SHALL FILE** a supplement to the AR containing copies of both Mr. Welbourn's and Ms. Shulin's deposition transcripts on or before **14 September 2022**. *See* 6 May Order at 21; *supra* note 3. In accordance with paragraph 12 of the protective order, ECF No. 17, the parties **SHALL FILE** public redacted versions of any sealed filings missing on or before **30 September 2022**. *See supra* note 5.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge